NOTICE
This Order was filed under Supreme
Court Rule 23 and is not precedent
except in the limited circumstances
allowed under Rule 23(e)(1).

NO. 4-18-0644

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JOHNNY R. PRIESTER, | ) | No.  12CF441 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Leslie J. Graves, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) the trial court did not err when it
denied defendant's *Batson v. Kentucky*, 476 U.S. 79 (1986) objection where
defendant failed to establish purposeful discrimination; (2) the State used a
witness's prior inconsistent statement as substantive evidence where the witness
lacked personal knowledge of the event, but the evidence was not closely
balanced; and (3) trial counsel was not ineffective for failing to tender a jury
instruction on accomplice-witness testimony.

¶ 2    Following a March 2018 trial, a jury found defendant, Johnny R. Priester, guilty

of (1) first degree murder where during the commission of the offense of first degree murder the

defendant personally discharged a firearm that proximately caused the death of another person

(720 ILCS 5/9-1(a)(2) (West 2010)), (2) aggravated battery with a firearm (720 ILCS 5/12-4.2

(West 2010)), and (3) aggravated discharge of a firearm (720 ILCS 5/24-1.2 (West 2010)).  In

August 2018, the trial court sentenced defendant to 60 years' imprisonment for first degree

murder to run consecutive to a 25-year sentence for aggravated battery with a firearm, and concurrent to a 5-year sentence for aggravated discharge of a firearm.

¶ 3        Defendant appeals, arguing (1) the trial court erred when it denied his objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), after the State used a peremptory challenge to exclude a black perspective juror from serving on the jury; (2) he was denied a fair trial when the State used a witness's prior inconsistent statement as substantive evidence where the witness lacked personal knowledge of the event; and (3) ineffective assistance of trial counsel where counsel failed to request a jury instruction on accomplice-witness testimony.  We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In June 2012, the State charged defendant with (1) first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) (count I), (2) first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2010)) (count II), (3) aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2010)) (count III), (4) aggravated discharge of a firearm (720 ILCS 5/24-1.2 (West 2010)) (count IV), and (5) unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2010)) (count V).  The charges stemmed from a May 28, 2012, shooting at 1229 North 14th Street in Springfield, Illinois, which resulted in the death of Quinton Harden and injured Dawn Schuster.

¶ 6                                A. Pretrial Motions

¶ 7        In February 2017, defendant filed a motion to sever the unlawful use of a weapon by a felon charge from the remaining charges.  The State filed a motion for use immunity under section 106-2.5(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/106-2.5(b) (West 2016)), asking the trial court to grant immunity to Lastacia Wright for her testimony as a witness against defendant.  In the motion, the State indicated if Wright testified inconsistently with her prior statements to police, including professing memory loss, the State intended to use

her prior recorded statements as substantive evidence pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2016)).  At a May 25, 2017, hearing, the trial court granted defendant's motion to sever and the State's motion for use immunity.

¶ 8                                B. Defendant's Jury Trial

¶ 9                                1. *Voir Dire*

¶ 10        In March 2018, during *voir dire*, the State exercised its first peremptory challenge on Yolanda W., a black female, arguing the strike was race-neutral where Yolanda W.'s nephew currently faced murder charges in Sangamon County, Illinois, and her responses indicated possible bias against police.  Defense counsel argued the challenge was not race-neutral where Yolanda W. indicated she had no bias against police.  The parties learned about the situation involving Yolanda W.'s nephew when Yolanda W. accepted an invitation to speak with the parties outside the presence of the other potential jurors.  When in chambers with the trial court and the parties, Yolanda W. expressed concerns regarding how some police officers treat people unfairly and the unique challenges she believed a black male faced when on trial.  In addition, Yolanda W. stated she knew police officers who were good people.  Yolanda W. stated unequivocally that she could be fair and impartial if she served on the jury.  Following their initial discussions, the court again instructed Yolanda W. to join the parties in chambers where Yolanda W. responded to additional questions.  Yolanda W. indicated her nephew's case was in the beginning stages and she understood each case was unique—involving specific facts and evidence.

¶ 11        Once Yolanda W. was excused from the room, the State again sought to exercise a peremptory challenge against Yolanda W.  Defense counsel objected arguing the State's reason

for challenging Yolanda W. was not race-neutral. The State maintained it offered a race-neutral reason based on her potential bias. Specifically, the State asserted,

"[Her nephew was] [f]acing similar charges that's being prosecuted by this office. She's made commentary in regards to officers and the manner in which at least she believes, she made statements in regards to whether they're good or bad. I think she comes in with bias. I don't think that she is at this point in time fair and impartial to the case, and I don't believe that based on where we're at that she should sit on this jury."

¶ 12 The trial court responded,

"I think her statement about officers, people in law enforcement being good or bad is the same thing anyone else would say. She has indicated she's not been to any proceedings. There have been very few proceedings. She's not indicated that she is—we've already asked her if she knew anybody in the courtroom.

I think if her nephew's case were two years old and it had been heavily discussed among the family, I think—I—her answers do not reflect your argument, and I'm going to deny it."

¶ 13 After a discussion off record, the trial court allowed the parties to make further arguments on the issue. However, the court stated,

"Before you make your arguments, another thing I want to point out for the record is that we do have already, you know, if

it's about—well, we already do have a person who is a convicted felon on the jury who—Michael G., who was not interrogated to this degree, and I believe that there are—when you think about it, he could very well have been."

¶ 14 Defense counsel pointed out that Michael G. was a white male per *Batson*. The State then argued defense counsel had not established a *prima facie* case of racial discrimination against Yolanda W. under *Batson*. Rather, the State provided several race-neutral reasons for challenging Yolanda W. Defense counsel responded, "[The State] passed on Michael G., a convicted felon. Who's white. And this is the first challenge, and they come to a black female, and they take their first challenge on her? I don't know how else you read it."

¶ 15 In response to defense counsel, the trial court stated, "[Yolanda W.] and [defendant] are African American and that, yes, the victim, victims are white. I'm going to—I am reconsidering my decision after slowing down and taking some time with this. And I don't think you've met your burden."

¶ 16 After completing the impaneling of the jury, the parties presented the following relevant evidence.

¶ 17 2. *Dawn Schuster*

¶ 18 Dawn Schuster testified that in May 2012 she resided at 1229 North 14th Street in Springfield with her sisters—Monica Hutchens and Elizabeth Pillischafske—and their eight children. At the time, Pillischafske's boyfriend, Quinton Harden also lived at the residence. Schuster described the residence as a one-story home with two bedrooms and a large front porch.

¶ 19 On May 27, 2012, Schuster hosted a birthday party for her daughter at the residence. That evening, after the party ended, Schuster, Harden, Pillischafske, Keonna Tucker,

some friends, and the children remained at the residence.  Acquaintances of Harden arrived at Schuster's residence in a red vehicle to talk with Harden, a tattoo artist.  Schuster testified that at some point one of the acquaintances, Julio—a light-skinned, heavier gentleman—"looked mad and kind of just distraught-looking and pac[ed] around [the front porch].  And we—I asked him to sit down because it was getting late, and I didn't want that in front of our house."  In response, Julio sat down and then left the residence on foot.  The other acquaintances eventually left in the red vehicle.

¶ 20       Schuster testified that, around 2 a.m. on May 28, 2012, Hutchens returned home to the group hanging out on the front porch.  At that time, Schuster looked down the street and observed two gentlemen standing under a streetlight on the corner of Reservoir and North 14th Street.  Schuster described the two men as a "heavyset light-skinned guy with a white shirt and black pants, [and] a tall dark-skinned black male also standing there."  Schuster identified Julio as the heavyset light-skinned man who had been at her house earlier in the evening.

¶ 21       At first, the two men just stood on the corner.  Eventually, Schuster observed the tall, dark black man cross the street toward her residence and as he got closer, he started shooting at the porch.  Schuster testified she heard more than eight gunshots.  Schuster stated once the gunshots stopped, "Everyone was on the ground on the porch.  And I was shot in both of my legs.  And I tried to get up, and I walked two steps, and then I realized I was shot more than I realized and my bone was broken."  Schuster observed Harden laying on the porch in a pool of blood.  After the shooting, the shooter walked away.  An ambulance arrived and took Schuster to the hospital.

¶ 22       After the shooting, Schuster spoke with police about the incident.  In her original statement to police, Schuster told police she had never seen either of the men before.  On June 1,

2012, Schuster viewed a physical lineup of potential suspects and failed to identify defendant as the shooter.

¶ 23                                    3. *Keonna Tucker*

¶ 24        Keonna Tucker testified that in May 2012 she was 11 years old. Around 2 a.m. on May 28, 2012, Tucker observed two black men standing under a streetlight on the corner. Tucker described the two men, one a heavier man and the other a tall skinny man. Both men wore white shirts and jeans. Tucker testified she told police the "fat black male" had been at the house earlier in the evening. Tucker testified the tall, skinny man walked toward the house and started shooting at the porch. Tucker observed the gun but could not describe it.

¶ 25        After the shooting, Tucker, with her mother present, spoke with police about the incident. Tucker described the shooter as a tall, black male wearing a white T-shirt, black pants, and black shoes. Tucker observed a photograph array and identified an individual other than Julio, who was in the photograph array, as the man who accompanied the shooter. Tucker later viewed a physical lineup which included defendant and failed to identify defendant as the shooter, instead identifying another individual in the physical lineup as the shooter.

¶ 26                                    4. *Elizabeth Pillischafske*

¶ 27        Elizabeth Pillischafske testified that on May 28, 2012, around 3 a.m. or 4 a.m., she was on the front porch of her residence when she observed two black males standing on the corner of North 14th Street and "the other street." Pillischafske described one of the men as heavyset and the other as tall. Pillischafske recognized the heavyset man as a man who was at her home earlier in the evening. The heavyset man wore a white wife-beater tank top.

¶ 28        After the two men stood on the corner and spoke for a bit, Pillischafske observed the taller, thinner man walk down the street and start shooting toward her residence.

Pillischafske heard several gunshots. Once the gunshots stopped, Pillischafske noticed Schuster was covered in blood and could not walk. Pillischafske testified Harden was shot in the head.

¶ 29    Pillischafske spoke with police after the shooting. Pillischafske viewed a photograph array where she identified Shane "Julio" Thompson as the heavyset man who had been at her residence earlier in the evening and as one of the men standing on the corner before the shooting. On June 1, 2012, Pillischafske viewed a physical lineup but was unable to identify anyone as the shooter.

¶ 30                    5. *Monica Hutchens*

¶ 31    Monica Hutchens testified that on May 27, 2012, her sister hosted a birthday party at their residence and later that evening, she left to go to her fiancé's house. Around 2:45 a.m. or 3 a.m. on May 28, 2012, Harden picked Hutchens up from her fiancé's house and took her home. After Hutchens returned to her house, she walked to a gas station with Pillischafske and Tucker. On her way home from the gas station, she passed a McDonald's and recognized a red vehicle owed by Zach Moad. Hutchens also observed a heavyset Hispanic man and a taller, thin black man walking down a street near her home. Hutchens returned to her residence and stood on the porch. Hutchens testified Ryan Townsley noticed two men standing on the corner of North 14th Street and Reservoir and directed everyone's attention to them. Hutchens recognized one of the men to be the heavyset Hispanic man she walked past earlier.

¶ 32    Hutchens testified, "The next thing I know is I noticed the taller black man had moved from the location of where he was at, and my phone rang. And at the same time as my phone rang and I answered it, I turned, and he was across the street. And we were eye to eye." The man then raised his arm and started shooting toward her porch. Hutchens dropped to the ground and Harden covered her. After the shooting, Hutchens called the police.

¶ 33        Hutchens spoke with police after the shooting and viewed a photograph array where she identified Julio as the heavyset man she passed on her way back from the gas station and as the man standing with the shooter on the corner of North 14th Street and Reservoir. Hutchens observed another photograph array but failed to identify defendant as the shooter. On June 1, 2012, Hutchens viewed a physical lineup and identified defendant as the shooter. Hutchens also identified defendant in the courtroom as the shooter.

¶ 34                                6. *Ryan Townsley*

¶ 35        Ryan Townsley testified that on May 28, 2012, he arrived at 1229 North 14th Street around 2 a.m., with his brother, Dakota Townsley. Ryan went to the residence to hang out and described Harden as a "neighborhood friend." Four men—two black males and two white males—Ryan did not know were at the residence receiving tattoos from Harden when he arrived. One of the black men introduced himself as Julio. Ryan testified Julio "was just roaming around the front of the house talking on his cell[ular] [tele]phone to somebody, tried to sell my little brother some marijuana." Schuster told Julio to go back inside or leave. Julio muttered something under his breath and walked off. Shortly after, the other three men left in a red vehicle.

¶ 36        Between 15 and 45 minutes later, Ryan saw Julio on the corner of North 14th Street and Reservoir standing under a streetlight with another man. Ryan described the other man as black, 25- to 35-years-old, six feet, two inches or six feet, three inches tall, 250 pounds, and wearing a hat. Ryan did not recognize the other man. Eventually, the tall black man ran across the street, stood across from the house, and fired a gun toward the porch four or five times.

¶ 37        Ryan spoke with police after the shooting and viewed a photograph array where

he identified Julio as the man who had been at the house earlier in the night and returned later,

standing under a streetlight at the corner. Ryan viewed a photograph array where he identified

defendant as the shooter. Ryan also identified defendant as the shooter in court.

¶ 38                        7. *Dakota Townsley*

¶ 39        Dakota Townsley testified that on May 28, 2012, he went with Ryan to a

residence at 1229 North 14th Street to drink and hang out. When he arrived at the residence,

multiple people were discussing tattoos with Harden. Dakota testified a heavier-set man with

"real messed up" teeth introduced himself as Julio. Julio wore a white wife-beater tank top and

plaid shorts. Dakota testified Julio tried to sell him marijuana. Dakota pulled out a wad of cash

but did not buy any marijuana from Julio. Dakota testified Julio "stepped in the other room on

the [tele]phone. So he just made us kind of leery that night, and [Schuster] then had told Julio to

go on his way." Julio took off walking not long after Schuster told him to leave. Dakota

testified, "He didn't really seem too angry, but nobody was really wanting him there at the

party."

¶ 40        Sometime later, Dakota and the others were on the front porch when he noticed

Julio standing on a nearby corner with another man. A few minutes later, the other man walked

across the street toward the house and started firing his gun at the porch. Julio remained on the

corner. Dakota described the shooter as six feet tall, between 30- and 40-years-old, bald with a

muscular frame, and wearing a white shirt and classic white Reebok shoes. Dakota viewed a

photograph array but failed to identify Julio or the shooter.

¶ 41                        8. *Lastacia Wright*

¶ 42        Lastacia Wright testified that in May 2012 she lived at 820 North 8th Street in Springfield.  Wright lived with defendant, her boyfriend Steve Bennett, and her children. Wright's best friend Shawanna Underhill often stayed at the residence as well.  Wright testified to having a sexual relationship with defendant at the time.  Wright testified defendant belonged to a record label called LBR.  Wright identified defendant in court.

¶ 43        On the evening of May 27, 2012, Wright hosted a birthday party at her residence. Wright testified defendant and Bennett were party attendees who drank and played card games. Shortly before midnight, defendant went to bed "because he was drinking, and he's not a drinker."

¶ 44        Sometime after midnight, Julio showed up at the house.  When Julio arrived at the house, "[h]e was sweating and out of breath and running on about something."  Wright testified that Julio said "some people tried to jump him; that's all I know.  I didn't ask him because I wasn't too fond of him."  Julio asked to speak to defendant but Wright "told him I wasn't waking him up.  He had to work in the morning."  Wright testified she did not remember Julio and defendant talking that night.  However, Wright testified she believed Julio and Bennett spoke that night.  Bennett and Julio then left the house.  Bennett returned to the house 45 minutes later. Wright testified defendant did not leave the house until someone picked him up for work the next morning around 5 a.m. or 6 a.m.  The parties stipulated defendant's boss, Audrey Austin, picked defendant up at 5 a.m. on May 28, 2012, from 820 North 8th Street and drove him to work.

¶ 45        After defendant left for work, Wright found bullets in defendant's possessions and gave them to Bennett.  Wright testified she never saw a gun.  Around 10:45 a.m. on May 29, 2012, police arrested defendant at Wright's house.  Immediately after police arrested defendant, Wright spoke with police in the back of a squad car about what happened the night of the

- 11 -

shooting. Wright maintained defendant never left the house in the early morning hours of May 28, 2012. On June 14, 2012, police interviewed Wright and she again maintained defendant never left the house in the early morning hours of May 28, 2012. On June 18, 2012, the State charged Wright with obstruction of justice.

¶ 46    On the morning of Wright's arrest—about 30 minutes before police took Wright into custody—Bennett returned to Wright's residence following his release from police custody. Wright testified Bennett told her a story to tell the police regarding what happened on May 28, 2012. According to Bennett, if Wright failed to tell police the story Bennett gave her, she would face criminal charges and the Department of Children and Family Services would take her children.

¶ 47    Wright testified Bennett told her to tell police defendant left the house in the early morning hours of May 28, 2012. Bennett told Wright to tell police defendant said he thought he got a "head shot." Wright testified defendant never mentioned anything about a "head shot" to her. Wright never saw a gun and Bennett told Wright to tell police he knew where the gun was. Bennett also told Wright to tell police she discovered a brown envelope attached to her mailbox and burned it.

¶ 48    Wright acknowledged police interviewed her on June 19, 2012, at the Sangamon County jail after her arrest for obstruction of justice. Wright testified she did not remember much of what she said during the interview with police. Wright denied telling police defendant said he "got a head shot" on the victim.

¶ 49    On cross-examination, Wright testified she lied to police during her June 19, 2012, interview. She only told police what Bennett told her to say. Specifically, Wright testified defendant never mentioned anything about a "head shot" to her but rather Bennett told her to tell

police defendant said that. Wright felt intimidated by the state's attorney and thus, lied about defendant's involvement. After defendant's arrest, Wright sent letters to him professing her loyalty and love to him. Wright remained in a relationship with Bennett when she wrote the letters to defendant.

¶ 50                                    9. *Shawanna Underhill*

¶ 51            Shawanna Underhill, also known as Shae, testified that in May 2012 she did not live in Springfield but often stayed at Wright's house. On the night of May 27, 2012, Wright hosted a party at her residence. Underhill attended along with Bennett and defendant. At the party, the group drank and played cards. Underhill testified that at some point, defendant went upstairs to bed while everyone continued to party. After defendant went to bed, a heavyset Hispanic man named Julio arrived at the house. Underhill knew Julio as "movie man" because he sold DVDs. Underhill testified Julio "had an association with" defendant.

¶ 52            When Julio arrived at the house, he appeared "[f]rantic, persistent" and stated he needed to speak with defendant. Underhill refused to wake defendant. Eventually, someone awakened defendant. Underhill acknowledged she may have told police in an interview that Wright awakened defendant. Julio went upstairs and eventually came back downstairs with defendant. Julio then left the house. Underhill testified she may have told police Bennett and defendant also left the house with Julio. Underhill did not remember what any of the three men wore that night.

¶ 53            Underhill testified Bennett and defendant returned to the house later that night. Once back at the house, defendant went upstairs and took a shower. Underhill recalled offering defendant bleach.

¶ 54    The next day, Bennett told her and Wright "stories" to tell the police. Underhill testified someone gave her some shell casings and she got rid of them. She did not recall who gave her the shell casings. Underhill acknowledged she may have told police that Wright and defendant were present when she took possession of the shell casings. Underhill threw the shell casings outside a liquor store on Enterprise between 9th and 10th Streets. Underhill did not recall any discussion about a gun.

¶ 55    On June 15, 2012, police interviewed Underhill. Underhill testified she may have told police defendant never left the house in the early morning hours of May 28, 2012. Underhill testified Bennett told her what to tell police, but she may have told police that Wright told her what to tell police. She recalled she lied to police when she told them she was Bennett's lover.

¶ 56    Underhill acknowledged she had a criminal record and had a case pending at the time of trial. She testified she had not been offered a deal in exchange for her testimony in this case. Underhill also testified she was drunk the night of May 27, 2012. Underhill suffered from epilepsy and memory loss. She testified that in May 2012, she took medication for seizures and she potentially took medication for bipolar disorder. Underhill suffered a seizure during cross-examination.

¶ 57    When Underhill appeared in court again a few days later, the State asked her if someone told her to tell the police defendant never left the house on the night of May 27, 2012. Underhill responded, "More than likely, probably so, because it's not something I would have come up with." Underhill testified Wright possibly told her what to tell police.

¶ 58                         10. *Shane "Julio" Thompson*

¶ 59    Shane Thompson testified that in 2012 he went by the nickname Julio. We refer to Thompson as Julio throughout this order. Julio testified under subpoena and the State paid his

- 14 -

travel expenses. Julio acknowledged his criminal record consisted of two prior drug-related convictions and other convictions.

¶ 60          In May 2012, Julio met defendant through LBR. Defendant owned the record booth located at Moad's residence. Julio acted as the record label's promoter. Julio identified defendant in court.

¶ 61          Around 11 p.m. on May 27, 2012, Julio rode with Moad to a residence at 1229 North 14th Street. Julio went to the residence and remained for about 30 minutes to an hour. Julio testified he went to the residence to receive a tattoo from Harden. Julio never received a tattoo because Harden ran out of time. Julio sold someone marijuana for $20.

¶ 62          While inside the residence, music played and one song that played sounded similar to a song produced by LBR. Specifically, Julio thought it sounded like a certain artist with LBR and others told him it did not. Julio testified "some words *** were thrown around, and I went outside and got on the [tele]phone at that point." Once outside, a female asked Julio to get out of the street and go back onto the porch. Julio testified he felt in danger because he believed people were talking about him. Subsequently, Julio left the residence on foot. Julio tried calling defendant but he did not answer his telephone.

¶ 63          Julio arrived at defendant's residence on North 8th Street about 10 to 15 minutes later. When he arrived at the residence, Wright answered the door. Julio told Wright the situation and she said, "He['s] upstairs asleep." Wright went upstairs and woke defendant up. Defendant called Julio upstairs. Julio told defendant about what happened on North 14th Street. Julio testified defendant "became raged. It was like, you know, he got to a point, he was like, he tired with people playing LBR, not taking this seriously, and just told me to go downstairs. He would be right there."

- 15 -

¶ 64    Defendant and Julio then walked to the corner of North14th Street and Reservoir. Julio directed defendant to the residence he was at earlier in the evening. Julio observed someone walk from the residence into the middle of the street. Defendant then pulled out a gun and ran toward the house firing his gun. After defendant fired the first shot, Julio ran north. Julio ran to 5th Street and North Grand Avenue where Moad picked him up.

¶ 65    Moad dropped Julio off at his mother's residence. About 15 minutes after the shooting, Julio spoke with defendant on his cellular telephone. Julio testified defendant said, "Y'all going to learn about playing with LBR." Subsequently, police made contact with Julio at his mother's residence.

¶ 66    Julio voluntarily went with the police and spoke with detectives about the incident. Julio also provided a written statement about the incident to police. However, Julio testified he ripped his first statement up and threw it away because it was not truthful. Julio testified he feared telling the truth because he witnessed a murder and feared for his life. Eventually, Julio wrote the name "Johnny Cash" on a slip of paper and then ate it. Julio testified he "wanted to tell who it was, but I didn't want to be the one that the finger pointed to saying who it was." Julio also wrote "Ray Charles" on another slip of paper. Police asked Julio for his cellular telephone and he informed police he left his telephone at his mother's residence. Police retrieved Julio's cellular telephone but he had erased all his telephone calls and text messages. Julio also removed the SIM card and tried to destroy it.

¶ 67    After several hours, Julio identified defendant as the shooter. Julio testified he did not want to go to jail for "something I didn't do, no." Julio viewed a photograph array where he identified defendant as the shooter. When Julio identified defendant in the photograph array, he wrote "I know [him] as Johnnie Ray. We walked to 14th and Reservoir. He walked south on

- 16 -

14th just before the shooting." Julio testified he saw defendant fire the gun and identified the gun as a .40-caliber.

¶ 68 After Julio implicated defendant as the shooter, police let him go. Subsequently, Julio left Springfield and moved to Arkansas "because of the fear of my own life and safety."

¶ 69                     11. *Zachary Moad*

¶ 70 Zachary Moad testified that around 11 p.m. on May 27, 2012, he went to a residence at 1229 North 14th Street. Moad drove to the residence in his red vehicle along with Julio and two other men to receive tattoos from Harden. Moad testified that when they arrived at the house Julio acted "very nervous" and there seemed to be friction between Julio and the Townsley brothers. Moad observed Julio go outside at some point and he went outside to check on him but could not find him. Eventually, Moad left with the other two men with whom he arrived and went to McDonald's.

¶ 71 While at McDonald's, Moad received a telephone call from Julio. Julio asked Moad, "Can you come pick me up? I'm down the road." Moad picked Julio up at 19th Street and North Grand Avenue. Moad testified Julio "was out of breath from running and sweating really bad." Moad drove Julio to Julio's house on Reynolds Street.

¶ 72                     12. *Steve Bennett*

¶ 73 Steve Bennett testified that in May 2012 he lived at 820 North 8th Street with Wright, defendant, Ricky Thompson, and Underwood. On the night of May 27, 2012, Wright hosted a party at the house. At the party, Bennett wore "black pants. I had on a red and black shirt with white in it, white stripe." Bennett's hair "was French-braided to the back." At the party, defendant wore a white shirt.

¶ 74     Sometime in the early morning hours of May 28, 2012, Bennett went to bed. Bennett woke up when Julio came into the house. Julio went upstairs to talk to defendant. A while later, Julio came back downstairs. Julio and defendant then left the house. Bennett followed them outside but did not see either man. Bennett called Julio and heard defendant in the background. Bennett walked to North 13th Street and Division, and while there, he heard eight gunshots. Bennet then ran to North 14th Street and Division where he met defendant. When Bennett met up with defendant, they exchanged shirts. Specifically, Bennett took defendant's white shirt and defendant took Bennett's red and black shirt. Defendant handed Bennett a gun and the men parted ways. Bennett headed back to his residence on North 8th Street.

¶ 75     When Bennett returned to the house, defendant was already in the shower. Defendant asked Bennett to "get rid of the gun." Defendant used Bennett's cellular telephone to call Julio. Defendant then went to bed with Wright. Bennett went to another bed. When Bennett woke up, he went to work.

¶ 76     After work, Bennett went back to the house where defendant gave him a silver and black handgun wrapped in a blue towel. Wright gave Bennett a bag of defendant's clothes to get rid of. Bennett buried the gun, magazines, and a glove filled with bullets in the back of a friend's house and put the bag of clothes in a dumpster. Bennett testified he lied to police when he initially told them he threw the gun on the roof of a California Kitchen restaurant.

¶ 77     Police interviewed Bennett on June 14, 2012, and June 15, 2012. During both interviews, Bennett told police neither he nor defendant ever left the house on the night of the shooting. Bennett also alleged Julio never came over to the house that night. After his interview with police on June 15, 2012, the State charged Bennett with obstruction of justice. On June 18,

- 18 -

2012, and June 19, 2012, Bennett spoke with police again but denied defendant gave him a gun to get rid of.

¶ 78    On June 20, 2012, Bennett told police defendant asked him to discard a gun. Bennet then took Officer Ryan Sims and Detective Steve Dahlkamp to the alley where he threw the clothes and to where he buried the gun, glove, and magazines. Bennett denied telling Wright and Underhill to lie to police. Bennett acknowledged he had a criminal record and, at the time of trial, he was in federal custody.

¶ 79                    13. *Officer Ryan Sims*

¶ 80    Ryan Sims, a Springfield police officer, testified that in May 2012, he investigated a shooting that occurred at 1229 North 14th Street. After Officer Sims spoke with multiple witnesses, Shane Thompson, also known as Julio, became the main shooting suspect. After interviewing Julio, defendant became the main suspect in the shooting.

¶ 81                    14. *Detective Steve Dahlkamp*

¶ 82    Prior to Detective Dahlkamp's testimony, the parties and the trial court went through transcripts of Wright's and Underhill's pretrial police interviews line-by-line and the court ruled on redactions.

¶ 83    Dahlkamp, a detective with the Springfield Police Department, testified that in May 2012, he interviewed multiple witnesses after defendant's arrest, including Wright and Underhill. Detective Dahlkamp along with Officer Sims interviewed Underhill and Wright. The State moved to admit Underhill's redacted June 15, 2012, two-part police interview through Detective Dahlkamp. The jury then received a transcribed copy of the interview in order to follow along while the recorded interview played. Underhill's June 15, 2012, police interview was played for the jury.

¶ 84 During the June 15, 2012, police interview, Underhill initially stated defendant never left the house in the early morning hours of May 28, 2012. After police informed her others were telling the truth, Underhill told police Wright gave her a story to tell police. Specifically, Wright told Underhill to say that Bennett called Julio to buy a movie and Underhill and Bennett had sex.

¶ 85 Underhill then agreed to tell police what actually occurred on May 28, 2012. Julio arrived at Wright's house and asked to speak with defendant. Then, Julio, defendant, and Bennett went for a walk outside. A while later, Bennett and defendant returned. Underhill told police defendant wore a white shirt and jeans. Bennett wore a red and blue shirt with cut sleeves. When they returned, defendant washed his body with bleach and washed his clothing. Underhill smoked a "blunt" with defendant and Bennett, and then went to bed.

¶ 86 Underhill never saw defendant with a gun, but she did see defendant with bullets. Underhill admitted she got rid of the bullets by throwing them behind a liquor store in an alley off Enterprise. Underhill took officers to the location where she discarded the bullets. Underhill told police Bennett probably knew where the gun was.

¶ 87 Next, the State moved to admit Wright's redacted June 19, 2012, police interview through Detective Dahlkamp. Defense counsel did not object. The jury received a transcribed copy of the interview to follow along with the police interview. The court allowed Wright's redacted June 19, 2012, police interview to be played for the jury.

¶ 88 During the June 19, 2012, police interview, Wright waived her rights and agreed to speak with police. Wright told police she could not speak with them on June 18—the day before—when they came to her house because she received an envelope in her mailbox. Wright burned the letter contained inside the envelope. Wright informed police that defendant told

everyone what to say to police. Wright did not want to testify in front of defendant because she was scared. Wright asked if she would still be facing obstruction charges and the officers responded that it would be up to the state's attorney but they were giving her a chance to "come clean."

¶ 89        Wright then gave a statement about what occurred on May 28, 2012. Wright stated Julio came over that night asking to speak with defendant. Julio stated earlier in the evening he had been asked to leave a party. Defendant and Julio left the house with a gun. Bennett followed the two men out the door. When defendant left the house, he was wearing a white shirt and blue jeans. Bennett wore a red and black shirt with the sleeves cut off and black jeans. Shortly after the men left, Wright heard sirens.

¶ 90        A while later, defendant and Bennett returned to the residence. Wright stated Bennett and defendant had switched shirts. Defendant asked for bleach, he put his clothes in the washer, and took a shower. Defendant told Wright he thought he shot someone and said, "I know I got that head shot." After defendant made that statement, Wright and defendant got into a dispute and defendant hurt his hand. Wright told defendant to leave her house, but eventually she allowed him to stay.

¶ 91        The next day, defendant told Wright and Underhill a story to tell about what happened the night before. Later, Wright brought Bennett up to speed on the story. At some point that day, defendant gave Bennett a gun and some bullets in a glove to get rid of. Defendant also gave Underhill bullets to dispose of. Wright never saw a gun, but the items defendant gave to Bennett were in a black bag.

¶ 92    Defendant told Wright to stick to the story he told her and make Julio the bad guy. Also, at that time, defendant read a newspaper article about the shooting and said, "I told you I got a head shot." Subsequently, police arrested defendant at Wright's residence.

¶ 93    After Wright's police interview played for the jury, Detective Dahlkamp testified he also interviewed Bennett on June 20, 2012. Detective Dahlkamp testified Bennett informed him he "buried the gun and the magazines, the bullets in a back[ ]yard of somebody he said that wasn't aware of it." During the interview, Bennett appeared "fearful." Bennett then took Detective Dahlkamp and Officer Sims to the location of the gun. Detective Dahlkamp "located a black Glock handgun, the magazine, and some bullets located in a glove tied around the trigger guard. But there was, there was—I questioned him about the second magazine, and I yelled across the fence if he knew where the second magazine was. And he said keep digging, which I did, and I finally located the second magazine with the bullets in it and all that." Detective Dahlkamp transported the items back to the station.

¶ 94                            15. *Physical Evidence*

¶ 95    A crime scene investigator found multiple shell casings in front of 1229 North 14th Street. Vickie Reels, a forensic scientist for the Illinois State Police, examined the recovered gun and shell casings found at the scene. Reels testified nine shell casings found at the scene were fired from the gun. Gary Havey, a forensic scientist with the Illinois State Police, testified he found no latent prints suitable for comparison on the buried gun or the glove. Reels testified based on a reasonable degree of scientific certainty no physical evidence connected defendant to the gun.

¶ 96                            16. *Jury Instructions*

¶ 97        At the close of the trial, the trial court instructed the jury, in relevant part, the

believability of a witness could be challenged if he made a statement that was inconsistent with

his trial testimony.  The court also instructed the jury regarding credibility of witnesses.

¶ 98                                17. *Jury Verdict*

¶ 99        The jury found defendant guilty of (1) first degree murder where during the

commission of the offense of first degree murder the defendant personally discharged a firearm

that proximately caused the death of another person, (2) aggravated battery with a firearm, and

(3) aggravated discharge of a firearm.

¶ 100        C.  Defendant's Posttrial Motions and Sentencing Hearing

¶ 101        On April 20, 2018, defendant filed a posttrial motion alleging, in part, "the trial

court erroneously allowed the jury to consider improperly admitted prior inconsistent statements

as substantive evidence in violation of section 115-10.1 of [the Code] (725 ILCS 5/115-10.1

(West 2014))."  Specifically, defendant alleged the State failed to employ the proper procedure

when confronting witnesses with their prior inconsistent statements.  On August 7, 2018, the

court denied defendant's posttrial motion and held a sentencing hearing.  The court heard

evidence in aggravation and mitigation, and defendant made a statement in allocution.

Ultimately, the court merged counts I and II and sentenced defendant to 60 years' imprisonment

for first degree murder to run consecutive to a 25-year sentence for aggravated battery with a

firearm, and concurrent to a 5-year sentence for aggravated discharge of a firearm.  On August

10, 2018, defendant filed a motion to reconsider his sentence.  Following a September 19, 2018,

hearing, the court denied defendant's motion to reconsider.

¶ 102        This appeal followed.

¶ 103                                II. ANALYSIS

¶ 104     On appeal, defendant argues (1) the trial court erred when it denied his objection

under *Batson*, after the State used a peremptory challenge to exclude a black perspective juror

from serving on the jury; (2) he was denied a fair trial when the State used a witness's prior

inconsistent statement as substantive evidence where the witness lacked personal knowledge of

the event; and (3) ineffective assistance of trial counsel where counsel failed to request a jury

instruction on accomplice-witness testimony.  We turn first to the *Batson* challenge.

¶ 105                          A.  *Batson* Challenge

¶ 106     Defendant argues the trial court erred when it allowed the State to use a

peremptory challenge to exclude a black prospective juror from serving on the jury.  The State

argues the trial court's finding that defendant failed to meet his burden of establishing purposeful

discrimination under *Batson* was not clearly erroneous.

¶ 107     To preserve an error for consideration on appeal, a defendant must object to the

error at trial and raise the error in a posttrial motion.  *People v. Sebby*, 2017 IL 119445, ¶ 48, 89

N.E.3d 675.  Failure to do so constitutes forfeiture.  *Id.*  However, we may consider a forfeited

claim where the defendant demonstrates a plain error occurred.  Ill. S. Ct. R. 615(a) (eff. Jan. 1,

1967).  To prevail under the plain error doctrine, defendant must first demonstrate a clear and

obvious error occurred.  *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11

(2007).  If an error occurred, we will only reverse where (1) "the evidence is so closely balanced

that the error alone threatened to tip the scales of justice against the defendant, regardless of the

seriousness of the error" or (2) the "error is so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process, regardless of the closeness

of the evidence."  *Id.*  Defendant forfeited this issue on appeal where he failed to raise the issue

in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48. Thus, we turn to whether a clear or obvious error occurred.

¶ 108 The United States Supreme Court in *Batson* established a three-step process to determine whether the State used a peremptory challenge to remove a venireperson solely based on race. *People v. Hudson*, 157 Ill. 2d 401, 425, 626 N.E.2d 161, 170 (1993). "First, a defendant must establish a *prima facie* case of purposeful discrimination in the State's exercise of its peremptory challenges." *Id.* Once a *prima facie* case of racial discrimination is established, the inquiry moves to the second stage where the burden shifts to the State to provide a "clear and reasonably specific" race-neutral explanation for using a peremptory challenge to strike the potential juror. (Internal quotation marks omitted.) *Id.* at 426. A race-neutral explanation is based on something other than the juror's race. *People v. Davis*, 231 Ill. 2d 349, 363, 899 N.E.2d 238, 246 (2008). Once the State provides a race-neutral reason for exercising the peremptory challenge, the defendant may rebut the proffered explanation. *Id.* "Finally, at the third stage, the trial court must determine whether the defendant has shown purposeful discrimination in light of the parties' submissions." *Id.* "The trial court's determination on the ultimate issue of discrimination is a finding of fact which turns on an evaluation of credibility and, therefore, is entitled to great deference on appeal [citation] and will not be reversed unless it is clearly erroneous [citations]." *Hudson*, 157 Ill. 2d at 426.

¶ 109 Here, the trial court never made a finding of a *prima facie* case of purposeful discrimination. Rather, after the court and counsel spoke with Yolanda W. outside the presence of the remaining jurors, the State moved to exercise a peremptory challenge to strike Yolanda W. and gave a race-neutral explanation before defendant objected or the trial court made any ruling. Following further discussion with Yolanda W., the State again moved to exercise a peremptory

challenge to strike Yolanda W. Defendant objected arguing the basis for the strike was not race-neutral. The trial court initially denied the State's peremptory challenge but allowed additional argument on the matter. Ultimately, the court found defendant failed to meet his burden of establishing purposeful discrimination.

¶ 110     Actually, based on the record of the proceedings during *voir dire*, we need not determine whether defendant made a *prima facie* showing under *Batson*, as the issue became moot after the State provided a race-neutral explanation for its peremptory challenge and the trial court found defendant failed to show purposeful discrimination. See *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 69, 142 N.E.3d 253. While the parties failed to clearly delineate each step of the three-step process under *Batson*, the trial court ultimately determined defendant failed to meet his burden of establishing purposeful discrimination. Therefore, we must determine whether the trial court's finding was clearly erroneous.

¶ 111     When the State asked to exercise a peremptory challenge against Yolanda W., it asserted race-neutral reasons. "To qualify as race neutral, the reason for exercising the peremptory challenge need not rise to the level of a challenge for cause, and the reason will be considered race neutral unless an intent to discriminate is inherent in the reason." *People v. Thomas*, 266 Ill. App. 3d 914, 920, 641 N.E.2d 867, 872 (1994). "If the State offered several reasons for exercising a peremptory challenge which the trial court accepted, it is only necessary that the reviewing court accept one of the reasons as race neutral to affirm." *Id.*

¶ 112     The State exercised a peremptory challenge against Yolanda W. because her nephew faced murder charges in Sangamon County and her responses to questions could be interpreted to indicate possible bias against police. The State argued,

"[Her nephew was] [f]acing similar charges that's being prosecuted by this office. She's made commentary in regards to officers and the manner in which at least she believes, she made statements in whether they're good or bad. I think she comes in with bias. I don't think that she is at this point in time fair and impartial to the case, and I don't believe that based on where we're at that she should sit on this jury."

¶ 113 During *voir dire*, Yolanda W. acknowledged being emotional because her nephew currently faced murder charges in Sangamon County in a case factually similar to defendant's case. However, Yolanda W. informed the trial court she could put her nephew's case aside and everyone deserved a fair trial. Yolanda W. also stated,

"Yeah. And you know, I just know—and I don't mean any disrespect. I've been in the presence of several law enforcement agents, you know, and some of them are just, they don't treat people fairly. They don't treat people right, you know. And like I said, I just want you to be treated fairly and, because there's a lot of officers for some reason that have bad attitudes, and they're not very honest a lot of them and different things, you know?"

However, Yolanda W. also stated she did not have a bias against the Springfield Police Department but was rather "just speaking in general" when she mentioned her knowledge of some police officers who failed to treat people right.

¶ 114 "When a member of the venireperson's family has been charged with or convicted of a crime, courts have held it was a race-neutral reason for excluding the person from the jury."

*Id.* Although Yolanda W. indicated she could put her nephew's case aside and everyone deserved a fair trial, the State's reason for excluding Yolanda W. constituted a legitimate race-neutral reason to exercise a peremptory challenge.

¶ 115    Defendant argued the State's reasoning was not race neutral because the State failed to question another juror in a similar manner. Specifically, defendant argued the State failed to extensively question Michael G., a white male convicted felon, to the same degree it questioned Yolanda W., a black female. Thus, the State's preemptory challenge could not be considered race neutral. While the trial court noted Michael G. was not interrogated to the same degree as Yolanda W., the court found defendant failed to show purposeful discrimination.

¶ 116    We note, the more extensive questioning of Yolanda W. stemmed from her request to speak with the court and the parties outside the presence of the other prospective jurors. Moreover, other than pointing out that Michael G. was a white male and a convicted felon, defense counsel failed to develop any argument as to how the State's failure to exclude Michael G. from the jury demonstrated purposeful discrimination. Also absent is any allegation of impropriety as to the prosecutor's credibility or demeanor in exercising the peremptory challenge. Even though Yolanda W. indicated she could be fair and impartial, the State was not required to accept her representation. The State was entitled to make the call and exclude Yolanda W. in light of her nephew's situation and her comments regarding police officers.

¶ 117    Thus, based on the record, we conclude the trial court's ruling was not clearly erroneous where the State provided a legitimate race-neutral reason for using a peremptory challenge and defendant failed to rebut the State's reason and meet his burden to show purposeful discrimination. Accordingly, defendant fails to demonstrate a clear or obvious error occurred.

¶ 118                    B. Prior Inconsistent Statement

¶ 119          Defendant next argues he was denied a fair trial when Wright's prior inconsistent statement to police was admitted as substantive evidence. During a June 19, 2012, interview, Wright told police defendant made the statement he "got that head shot" when talking about the May 28, 2012, shooting. Defendant argues Wright's statement was inadmissible because she lacked personal knowledge of the shooting. The State argues the admission of Wright's prior inconsistent statement as substantive evidence failed to deprive defendant of a fair trial.

¶ 120          Initially, we note defendant failed to object to the admission of Wright's statement during Wright's trial testimony or when the State played her police interview through Detective Dahlkamp. Further, defendant cross-examined Wright regarding her statement. Defendant also failed to object, on the grounds he asserts on appeal, to the admission of Wright's statement in his posttrial motion. Thus, the issue is forfeited on appeal. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 121          Defendant argues that if he failed to preserve the issue on appeal, this court may review the issue under the first prong of the plain error doctrine. See *Piatkowski*, 225 Ill. 2d at 565. The State argues defendant failed to preserve this issue on appeal and plain error is not applicable where defendant invited the error when he cross-examined Wright about her prior inconsistent statement to police. We find a plain error analysis appropriate. Thus, we must first determine whether a clear or obvious error occurred. See *id.*

¶ 122                    1. *Clear or Obvious Error*

¶ 123          "Generally, a party may only use a prior inconsistent statement for purposes of impeachment." *People v. Morgason*, 311 Ill. App. 3d 1005, 1010, 726 N.E.2d 749, 752 (2000). However, there is an exception which allows prior inconsistent statements of a testifying witness

to come in as substantive evidence. *People v. McCarter*, 385 Ill. App. 3d 919, 930, 897 N.E.2d 265, 276 (2008). Under section 115-10.1 of the Code (725 ILCS 5/115-10.1(c)(2) (West 2016)), a prior inconsistent statement of a witness may be admitted as substantive evidence if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge."

¶ 124      "Personal knowledge" means "having actually perceived the events that are the subject of the statement. Excluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party." *Morgason*, 311 Ill. App. 3d at 1011 (citing *People v. Cooper*, 188 Ill. App. 3d 971, 973, 544 N.E.2d 1273, 1274 (1989)). "[T]o satisfy the personal-knowledge requirement of the statute, 'the witness must have observed, and not merely heard, the subject matter underlying the statement.' " *Id.* (quoting *People v. Hastings*, 161 Ill. App. 3d 714, 720, 515 N.E.2d 260, 264 (1987)).

¶ 125      Based on the record, there is no evidence Wright was present at the scene of the shooting. In the early morning hours of May 28, 2012, Wright remained at her residence. Wright never observed the murder of Harden or had any first-hand knowledge of the events that transpired at the scene of the shooting. Rather, Wright's knowledge of the shooting derived from what defendant told her. Therefore, Wright's statement to police that defendant told her he "got that head shot" could not come in as substantive evidence. Where Wright lacked personal knowledge of the shooting under section 115-10.1 of the Code, we find a clear or obvious error occurred when Wright's prior inconsistent statements about the "head shot" came in during trial. Having found a clear or obvious error, we turn to whether the error amounted to first-prong plain error.

¶ 126                          2. *First-Prong Plain Error*

¶ 127          "Where the defendant claims first-prong plain error, a reviewing court must

decide whether the defendant has shown that the evidence was so closely balanced the error

alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51.  To

determine "whether the evidence adduced at trial was close, a reviewing court must evaluate the

totality of the evidence and conduct a qualitative, commonsense assessment of it within the

context of the case." *Id.* ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53, 23 N.E.3d

325).  "A reviewing court's inquiry involves an assessment of the evidence on the elements of

the charged offense or offenses, along with any evidence regarding the witnesses' credibility."

*Id.*  Throughout this inquiry, the burden of persuasion remains on the defendant.  *People v.*

*Nowells*, 2013 IL App (1st) 113209, ¶ 19, 1 N.E.3d 578.

¶ 128          Defendant argues the evidence presented at trial was not overwhelming where

multiple witnesses were unable to identify the shooter in either a photograph array or at a

physical line-up.  Multiple witnesses also presented contradictory testimony in describing the

physical appearance of the shooter.  Further, defendant argues multiple witnesses possessed

potential bias, had a motive to lie, or were unworthy of belief where their trial testimony was

inconsistent with prior statements to police.  We disagree and find the evidence was not closely

balanced.

¶ 129          Two eyewitnesses—Hutchens and Ryan—identified defendant as the shooter.

Neither Hutchens nor Ryan had any reason to lie where neither of them knew defendant or Julio

before May 28, 2012.  Hutchens testified she passed two males on her walk home from the gas

station and later observed those two men standing on the corner of her street before one of the

men opened fire.  Further, Julio also identified defendant as the shooter.  Julio testified he went

to Wright's residence after leaving a party and asked to speak with defendant. Then, he and defendant walked to the corner of 14th Street and Reservoir where he pointed out to defendant the house he had been at earlier in the evening. Julio observed defendant pull out a gun and run toward the residence firing his gun. Julio testified he saw defendant fire the gun and identified the gun as a .40-caliber. Wright and Underhill corroborated Julio's story that sometime in the early morning hours of May 28, 2012, Julio arrived at Wright's residence asking to speak with defendant.

¶ 130 Bennett testified that after the shooting, defendant gave him a gun to dispose of and he discarded it in a backyard. Later, Bennett directed police to the gun, bullets, and magazines. The police recovered the items and forensic testing linked the gun to the shell casings found at the scene of the shooting. Wright confirmed defendant gave Bennett something to discard after the shooting.

¶ 131 Based on the record, we find the totality of the evidence substantiates the commonsense assessment that this case was not closely balanced. Even without Wright's prior inconsistent statement to police that defendant told her he "got that head shot," the evidence presented was more than sufficient to prove defendant was the shooter. Given the evidence in this case was not closely balanced, defendant fails to satisfy the first prong of plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 132                            3. *Ineffective Assistance of Counsel*

¶ 133 In the alternative, defendant argues his trial counsel was ineffective for failing to object to Wright's prior inconsistent statement being admitted as substantive evidence where Wright lacked personal knowledge of the shooting.

¶ 134       We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Id.*

¶ 135       Both prongs of the *Strickland* test must be satisfied; therefore, a finding of ineffective assistance of counsel is precluded if a defendant fails to satisfy one of the prongs. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.  "A court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38, 743 N.E.2d 521, 540 (2000).  Prejudice results when there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different. *People v. Simms*, 192 Ill. 2d 348, 362, 736 N.E.2d 1092, 1106 (2000).  Here, defendant is unable to establish prejudice.

¶ 136       We find trial counsel's failure to object to the admissibility of Wright's prior inconsistent statements, where she lacked personal knowledge, did not prejudice defendant.  As stated above, the totality of the evidence was more than sufficient to prove defendant was the shooter.  Absent Wright's prior inconsistent statement to police that defendant told her he "got that head shot," there is no reasonable probability the result of the proceedings would have been different.  Thus, defendant's ineffective assistance of counsel claim fails.

¶ 137              C. Ineffective Assistance of Counsel

¶ 138       Last, defendant argues ineffective assistance of trial counsel where his counsel failed to tender Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014)

(hereinafter IPI Criminal No. 3.17), the accomplice-witness jury instruction. Specifically, defendant argues an accomplice-witness instruction would have informed the jury to view Julio's testimony with suspicion and caution where Julio provided incriminating evidence against defendant when Julio was also at the scene of the shooting and had a motive to commit the shooting. The State argues trial counsel did not err by not requesting IPI Criminal No. 3.17 where the decision was a matter of trial strategy and defendant was not prejudiced by the absence of the instruction.

¶ 139          As stated above, to succeed on a claim of ineffective assistance of counsel, defendant must show (1) the attorney's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687. "We must show great deference to the attorney's decisions as there is a strong presumption that any attorney has acted adequately." *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43, 964 N.E.2d 1276 (citing *Strickland*, 466 U.S. at 689).

¶ 140          IPI Criminal No. 3.17 states "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

¶ 141          The test for determining if a witness constitutes an accomplice, thus making the giving of the accomplice witness instruction appropriate, is " 'whether there is probable cause to believe that [the witness] was guilty either as a principal, or on the theory of accountability.' " *People v. Cobb*, 97 Ill. 2d 465, 476, 455 N.E.2d 31, 35 (1983) (quoting *People v. Robinson*, 59 Ill. 2d 184, 191, 319 N.E.2d 772, 776 (1974)). That is, the evidence must show there is probable cause to believe that the witness was not merely present " 'and failed to disapprove of the crime,

but that he participated in the planning or commission.' " *People v. Kirchner*, 194 Ill. 2d 502, 540, 743 N.E.2d 94, 114 (2000) (quoting *People v. Henderson*, 142 Ill. 2d 258, 315, 568 N.E.2d 1234, 1261 (1990)).  An individual's presence at the scene of the crime, knowledge the crime is being committed, close affiliation to the defendant before and after the crime, failing to report the crime, and the fleeing from the scene of the crime may be considered in determining whether the individual may be accountable for the crime or shared a common criminal plan or agreement with the principal.  *People v. Taylor*, 164 Ill. 2d 131, 140-41, 646 N.E.2d 567, 571 (1995).

¶ 142        Here, the evidence presented at trial showed Julio was merely present at the scene of the shooting and failed to perform an act that would render him accountable for defendant's actions.  While Julio took defendant to the location of the shooting, fled the scene after the shooting, and failed to report the crime, Julio indicated he was unaware defendant intended to shoot anyone.  Further, police first questioned Julio as the prime suspect but let him go and never charged him.  Importantly, defense counsel subjected Julio's veracity to meaningful adversarial testing when he challenged Julio's version of events and questioned his credibility during multiple stages of trial.  See *People v. Patterson*, 347 Ill. App. 3d 1044, 1053, 808 N.E.2d 1159, 1166 (2004).

¶ 143        Even if counsel's failure to request an accomplice-witness instruction fell below an objective standard of reasonableness, defendant cannot show he was prejudiced by his counsel's failure to tender the instruction on accomplice-witness testimony.

¶ 144        "Failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so 'critical' to the defense that its omission 'den[ied] the right of the accused to a fair trial.' "  *People v. Rodriguez*, 387 Ill. App.

3d 812, 828, 901 N.E.2d 927, 942 (2008) (quoting *People v. Pegram*, 124 Ill. 2d 166, 174, 529 N.E.2d 506, 509 (1988)).

¶ 145     At trial, Julio disclosed he testified under subpoena and the State paid for his travel expenses. Julio also acknowledged his criminal record included prior drug-related convictions and other convictions. As stated above, defense counsel conducted meaningful adversarial testing against Julio during multiple stages of trial. On cross-examination, defense counsel impeached Julio's credibility and theory of the case. Julio acknowledged he only disclosed defendant as the shooter after having first lied to police and he did so only after indicating he did not want to go to jail for the crime. After Julio told police defendant was the shooter, he was free to go and was never charged with a crime related to the shooting. During closing argument, defense counsel continued to attack Julio's testimony in depth. Finally, the trial court instructed the jury the believability of a witness could be challenged if he made a statement that was inconsistent with his trial testimony and it was up to the jury to judge the credibility of a witness.

¶ 146     "[T]he purpose of the accomplice-witness instruction is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in return for *** lenient treatment." *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 62, 67 N.E.3d 542. Even in the absence of an accomplice-witness instruction, defense counsel exposed quite plainly why the jury should view Julio and his testimony with heightened suspicion. Therefore, defendant cannot show prejudice where the jury was warned in depth of Julio's potential motivation to provide false testimony.

¶ 147     Moreover, there exists no reasonable probability the result of the trial would have been different if defense counsel tendered, and the trial court gave, an accomplice-witness

instruction because defendant's conviction did not rest solely on Julio's testimony. As stated above, two eyewitnesses identified defendant as the shooter. Further, testimony from Bennett and Wright linked defendant to the gun and forensic testing linked the gun to the shell casings found at the scene of the shooting. Therefore, we reject defendant's ineffective assistance of counsel claim.

¶ 148                                     III. CONCLUSION

¶ 149          For the reasons stated, we affirm the trial court's judgment.

¶ 150          Affirmed.