(No. 52944, 53038 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. PERRY COBB et al., Appellants.

*Opinion filed October 4, 1983.*

470

Theodore A. Gottfried, State Appellate Defender, and Steven Clark, Deputy Defender, of the Office of the State Appellate Defender, of Chicago, for appellant Perry Cobb.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, of counsel), for appellant Darby Williams.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joan S. Cherry, Michele A. Grimaldi, and Bruce A. Cardello, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

Helene M. Kardell, of Schiff, Hardin & Waite, of Chicago, for *amici curiae* the National Alliance Against Racist & Political Repression *et al.*

CHIEF JUSTICE RYAN delivered the opinion of the court:

Perry Cobb and Darby Williams were jointly tried by jury in the circuit court of Cook County for the armed robbery and murder of Melvin Kanter and Charles Guccion. The first and second trials ended in hung juries. At the third trial, the jury found Cobb and Williams guilty of both crimes, and they were sentenced to 30 to 60 years' imprisonment for armed robbery. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)), the People requested a sentencing hearing for the murder convictions. The jury found that one or more aggravating factors set forth in section 9—1(b) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)) were present and that no mitigating factors existed sufficient to preclude the imposition of the death penalty. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) The trial court sentenced the defendants to death, but stayed the sentences pending direct appeal to this court. (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d Rules 603, 606.) We reverse the defendants' convictions and remand this cause to the circuit court for a new trial.

At the third trial, Dr. Robert Stein, the medical examiner, testified that both victims died as a result of bullet wounds to the head. The key prosecution witness, Phyllis Santini, testified that on the evening and early morning of November 12 and 13, 1977, she spent approximately 10 hours driving with various individuals. At approximately 8 p.m., she met Johnny Brown, her boyfriend, at Terminal Liquors. They drove to Sheridan Liquors, where they met Earl Grant. They continued driving for several more hours. After Grant left the group, Brown and Santini met Cobb and Williams at 11:30 or

12 o'clock near the Biarritz Lounge. Santini had not previously met Williams, but had known Cobb and was aware of his criminal background and violent reputation.

Santini stated they subsequently drove back to Terminal Liquors. Cobb and Williams bought a bottle of liquor, and they continued their ride. Santini argued with Johnny Brown about their relationship. According to Santini, Brown left the group about 2:30 or 3 a.m.

Santini testified that she continued driving with Cobb and Williams. Between 4:30 and 5:30 a.m., Cobb asked Santini to "do him a favor" and told her if she cooperated he would take care of her problems. She had been complaining about having been beaten by a man with whom she had been living. She stated that Cobb told her to drive to a friend's house located on Kenmore Avenue. When they arrived, Cobb went inside but returned in a short time. He then told her to drive back to Terminal Liquors. While they drove, he talked about money. She testified that Cobb said "if he could just put his hands on a few thousand, that he could turn it over and over again, and that he would really want to get back at the Feds for what they had done to him, taking his money and his jewelry and his cars." When they approached Terminal Liquors, Santini testified that Cobb told her to park across the street from Mel's Red Hots, a diner, located on Clarendon Avenue. He instructed her to wait in the car and keep the motor running. He also told her not to worry. About 5:45 a.m., Williams and Cobb left the car and walked across the street.

Santini testified that before Cobb and Williams entered Mel's, they spoke to Earl Grant, who had just crossed Broadway from Terminal Liquors. After speaking briefly with him, Grant remained outside while Cobb and Williams entered the diner from the Broadway entrance. Santini said that when they first entered Mel's she could see their heads. After a few minutes, they dis-

appeared from view, but within approximately 15 minutes they ran back to her car. Santini said she did not see guns, money or jewelry. Cobb told her, "Let's get the hell out of here." She said he grabbed her hair when she indicated she did not know where to go. As she drove away, she saw Earl Grant running from the scene of the crime. She testified that, on the way back to the house on Kenmore, Cobb and Williams said that the people on the street were misinformed. They had told them Mel kept a few thousand dollars at the store, but they had only found a few dollars.

Santini stated she learned for the first time the next afternoon that an armed robbery and murder had been committed at Mel's. She did not tell the police, however, until three weeks later, on December 5, 1977. She said she failed to contact the police earlier because of her fear for her life.

The other chief prosecution witness, Arthur Shields, a bartender at Terminal Liquors, testified that he entered Mel's a short time after defendants had left. He discovered the bodies of Melvin Kanter, the owner, and Charles Guccion, a customer, in the restroom. He had been at the store a few minutes earlier looking for his boss, at which time he had seen both victims alive.

Shields testified that he had seen two black men standing inside the door at Mel's about the time the crimes were committed. One was approximately 5 feet 11 inches tall, weighed approximately 170 to 175 pounds, had a thin moustache, and wore a brown coat and an orange stocking cap. The other was approximately 5 feet 7 inches tall, had a stocky build, a dark complexion, a round face, and a beard. Shields was impeached, however, by various inconsistencies in his identification testimony at the three trials. Shields also made a positive identification of the defendants at the third trial, but was impeached by his testimony from the first two trials

that they resembled the men he saw, but he could not make a positive identification.

When confronted with these inconsistencies, Shields also admitted he previously stated that he had not seen the faces very well and thought all blacks looked alike in pictures. At the second trial, he admitted that he did not pay careful attention to the faces of the two men because he assumed they were regular customers. He also admitted he had only seen the men for approximately five seconds.

In their defense, Cobb and Williams sought to create a reasonable doubt of their guilt by discrediting Arthur Shields and Phyllis Santini, and implying that Phyllis Santini and Johnny Brown committed the crimes. They contended that Phyllis Santini could not be believed because she participated in the crimes. According to her testimony, she was at the scene of the crimes and drove the getaway car. They argued that, as an accomplice, she was not a credible witness. Similarly, defendants argued, Arthur Shields was also not a credible witness, since he only saw the assailants for five seconds and yet claimed his recollection of their features improved with successive trials.

When arrested, Cobb was in possession of some items which had been taken from the victims. Cobb testified that Brown had sold the stolen watch and jewelry to him after the murders were committed.

Two witnesses, Charles Bonner and his brother, Robert Bonner, testified that they were with defendant, Darby Williams, and others in Terminal Liquors on the evening following the murders. When two police officers came into the bar, Arthur Shields, the bartender, told the police that Williams was a regular customer and was not the individual he had earlier seen in Mel's. Additionally, Charles Bonner testified that Johnny Brown was a notorious drug dealer and pimp who frequently at-

tempted to sell stolen jewelry to support his drug habit. According to Bonner, Brown frequently associated with a tall friend who often wore an orange hat.

The defendants made offers of proof concerning inculpatory statements made by Phyllis Santini after the crimes were committed. The defendants offered to prove that Patricia Usmani would testify that, in June of 1978, she had a conversation with Phyllis Santini and Susan Darks in Santini's car. Santini admitted that she participated in the robbery of the restaurant, along with Johnny Brown and two other individuals whom she did not name. She also acknowledged that all four of them were inside the restaurant and that Brown had shot the two men. After the robbery, Brown sold Perry Cobb the watch and ring taken from Melvin Kanter but kept the gold necklace. After hearing the offer of proof, the trial court refused to allow Usmani to testify because a proper foundation had not been laid to impeach Santini by a prior inconsistent statement.

The defendants also sought to call Carol Griffin, a school truant officer. The defense represented that Griffin would testify that Santini told her that she expected to receive a reward in exchange for her testimony. The defense had earlier attempted to lay a foundation for Griffin's testimony by asking Santini, on cross-examination, whether she knew Carol Griffin and whether she had told Griffin that she expected a reward for testifying. In ruling that Griffin could not testify as to this statement, the court ruled that the defense had not set a time or place of the alleged conversation. We will discuss further the offers of proof and the court's rulings as to Usmani and Griffin later in this opinion.

At the conclusion of the third trial, the defendants requested an accomplice instruction. The trial court refused to give the instruction, reasoning that Santini testified she was not "fully aware" that Cobb and Wil-

liams committed the crimes until the following day. This is not the test of whether an accomplice instruction should have been given. In *People v. Robinson* (1974), 59 Ill. 2d 184, in discussing the test used to determine whether a witness is an accomplice, this court stated:

"The question is whether there is probable cause to believe that [the witness] was guilty either as a principal, or on the theory of accountability." (59 Ill. 2d 184, 191.)

The court, in *Robinson*, stated that the finding that a witness was an accomplice entitled the defendant to a cautionary instruction as to the reliability of the witness' testimony. In *People v. Nowak* (1970), 45 Ill. 2d 158, this court stated that an accomplice is one who could himself have been indicted for the offense either as a principal or as an accessory. See also *People v. Hrdlicka* (1931), 344 Ill. 211, 221-22.

Although Santini professes not to have known about the planned armed robbery of Mel's restaurant, there is, nonetheless, sufficient evidence in the record to justify her indictment either as a principal or on the theory of accountability (Ill. Rev. Stat. 1977, ch. 38, par. 5—2). We have detailed above Santini's activities during the night as she drove Brown, Cobb and Williams, and later just Cobb and Williams, from one place to another. When they arrived at Mel's restaurant she was told to park across the street and keep the motor running. She saw Cobb and Williams meet Earl Grant outside Terminal Liquors and noticed that Grant remained outside Mel's. After seeing the men hurriedly flee the scene of the crime, she aided their escape by driving the getaway car. During the getaway she heard the men discuss their disappointment at having obtained only a small amount of money. Finally, she failed to disclose to the police her knowledge of the crime until three weeks later. Under these circumstances, Santini could have been indicted for both armed robbery and murder. (*People v. Kessler* (1974), 57 Ill. 2d 493.) The court

erred in not giving the defendants' tendered cautionary accomplice instruction.

Returning now to the offer of proof as to Usmani's testimony, after the defense made its offer of proof, the prosecution argued to the court that Usmani was not on the list of witnesses and also that a proper foundation for her testimony had not been made. Defense counsel responded that they had not succeeded in locating Usmani until October 2, 1979, two days before, despite a diligent search. They also noted that Santini had already testified on September 28, 1979. While she had not been questioned at that time about her statement to Usmani, the defense had not known what Usmani would tell them until she was located.

The trial court ruled that Usmani could not testify without the defense laying a foundation for the introduction of the statement as a prior statement inconsistent with Santini's testimony. The defense then sought to recall Santini. The prosecution argued that the defense had just told them that morning that it would not seek to recall Santini. Consequently, the prosecution had informed Santini she would not be needed and she had gone home. Based on these assertions, the prosecution argued that the defense was improperly seeking to delay the trial and asked the trial court to deny a defense request for a continuance. The trial court ruled that Santini could testify if she were present, but refused to grant a continuance or postponement to allow the defense to locate her. No representation was made that Santini could not be recalled without a lengthy delay. The court also did not ask the defense how long it would take to procure her. As Santini was not immediately available, the defense was forced to rest without presenting further witnesses.

The granting or refusing to grant a motion for continuance in a criminal case lies in the sound discretion of the trial court. (*People v. Lott* (1977), 66 Ill. 2d 290, 296.) Sec-

tion 114—4(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—4(f)) provides: "After trial has begun a reasonably brief continuance may be granted to either side in the interests of justice." Section 114—4(h) provides: "This Section shall be construed to the end that criminal cases are tried with due diligence consonant with the rights of the defendant and the State to a speedy, fair and impartial trial." (Ill. Rev. Stat. 1977, ch. 38, par. 114—4(h).) Thus there are competing interests that must be weighed in considering a motion for a continuance made during trial—the rights of the parties and the diligent disposition of the case. In *Lott* this court stated:

> "There is no mechanical test, statutory or other, for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend." *People v. Lott* (1977), 66 Ill. 2d 290, 297.

In our case Santini was the prosecution's most important witness. If believed by the jury, her testimony, standing alone, is sufficient to convict the defendants. It is her testimony that recites every detail of the evening's activities. Without her testimony the prosecution would be left with only some circumstantial evidence and the vague equivocal testimony of the bartender, Shields. Usmani's testimony concerning Santini's admission directly contradicts the testimony that Santini gave at the trial. If believed by the jury, this out-of-court admission would seriously damage the State's case against these defendants. Usmani's testimony concerning Santini's statement also supported the defense theory that Brown and Santini committed the crimes. Moreover, her testimony also supported Cobb's contention that he got the stolen watch from Brown and explained why the police never recovered a gold necklace. In a capital case, the importance of an early disposition of the case weighs less heavily than the paramount goal of ensuring that two possibly innocent men are not executed. We therefore hold that the trial court abused

its discretion by refusing to allow the defense a reasonable opportunity to locate and recall Santini to perfect a foundation for Usmani's testimony.

As to the offer of proof of Carol Griffin's testimony, we find that the trial court also erred when it excluded evidence of Phyllis Santini's admission that she expected to receive a reward in exchange for testifying for the prosecution. In laying the foundation for this testimony, defense counsel, on cross-examination of Santini, had asked:

"Q. Did you ever tell anyone you expected to receive a reward to testify in this case?

A. No, sir.

\* \* \*

MR. WARE: Q. Do you know Carol Griffin?

THE WITNESS: A. Yes.

\* \* \*

Q. Had you ever told Carol Griffin you were going to receive a reward for your testimony in this case?

A. No, sir."

When the defense called Carol Griffin to testify that Phyllis Santini told her that she expected to receive a reward in the case, the People objected, arguing that a sufficient foundation for this prior inconsistent statement had not been laid. The court excluded Griffin's testimony and refused to allow the defense to recall Santini to set the time, place, or circumstances of the alleged conversation.

Before a witness may be impeached by his prior inconsistent statement, a proper foundation must have been laid to prevent unfair surprise and give the witness the opportunity to explain. (*People v. Smith* (1980), 78 Ill. 2d 298.) In seeking to meet this requirement, counsel generally must direct the attention of the witness on cross-examination to the time, place, and circumstances of the statement as well as to its substance. *People v. Sanders* (1974), 56 Ill. 2d 241.

In *People v. Henry* (1970), 47 Ill. 2d 312, this court discussed the accepted rule of requiring that the attention of

the witness be called to the time, place, and circumstance of the alleged inconsistent statement and said:

"However, we consider under the circumstances of this case that the foundation was adequate to permit the defendants to attempt to impeach the witness. The rationale of requiring a foundation is to protect the witness against unfair surprise and to permit his explanation of the prior statement. We believe the questions propounded on cross-examination did substantially satisfy the reasons for the rule requiring a foundation. Wigmore criticizes what he considers formalism in this regard. He says: 'If the preliminary question is to be useful as a warning to enable the witness to prepare to disprove the utterance or to explain it away if admitted, it must usually specify some details as to the occasion of the remark. The witness may perhaps without this understand the occasion alluded to; but usually he will not, and in such a case this specification of the details is a mere dictate of justice. The modern tendency of American Courts, however, is to lose sight of the fact that this specification is a mere means to an end (namely, the end of adequately warning the witness), and to treat it as an inherent requisite, whether the witness really understood the allusion or not. The result of this is that unless the counsel repeats a particular arbitrary formula of question, he loses the use of his evidence, without regard to the substantial adequacy of the warning. Such a practice is impolitic and unjustified by principle.' [Citation.]" (47 Ill. 2d 312, 322.)

In *Henry* this court also stated that it is within the discretion of the trial court to permit the recalling of the witness for the purpose of perfecting the foundation if the defendants seek to recall the witness. *People v. Henry* (1970), 47 Ill. 2d 312, 322.

In our case we feel that Santini was properly alerted to or warned of her prior inconsistent statement by the questions that had been asked on cross-examination. If, however, the trial court felt that the proper foundation had not been laid, under the circumstances of this case we find that the court abused its discretion in not permitting defense

counsel to call Santini back to the stand to perfect the foundation. We again emphasize the crucial nature of Santini's testimony and how important to the concept of justice it is that the defendants be given every opportunity to present testimony to the jury that legitimately may cast doubt on the veracity of her testimony. The failure to give the accomplice instruction, the limitation on the use of Usmani's testimony, and the denial of the use of Griffin's testimony deprived the defendants of a fair trial and require the reversal of the defendants' convictions and that the cause be remanded to the circuit court of Cook County for a new trial.

Cobb and Williams made a pretrial motion for severance, which was denied. Although the defendants were admittedly jointly tried on the supposition they acted together, the People now contend that Cobb should not be permitted to raise the exclusion of Patricia Usmani's testimony as error. The People argue that Usmani was solely Williams' witness and Cobb did nothing to secure her presence at trial. Moreover, the People contend Cobb's defense was simply that the prosecution did not sustain its burden of proof, and unlike Williams, he did not seek to shift the responsibility for the crimes to Santini and Brown. It is therefore argued that Cobb should not be permitted to rely on an error raised only by Williams for purposes of appeal. Similarly, the People also submit that Cobb did not make a claim of error in his new trial motion or in his brief before this court concerning the exclusion of Carol Griffin's impeaching testimony. Consequently, it is argued that Cobb should not now be permitted to rely on appeal on this claim of error.

In light of the prejudicial error regarding the accomplice instruction, which undeniably affected Cobb, he would be entitled, on that ground alone, to a new trial. Prejudicial errors concerning Williams, however, inevitably affected Cobb. This is particularly true in this case, where

the key controversy surrounded Phyllis Santini's credibility. Her testimony was central to the People's case against both defendants. Any testimony which would have tended to undermine her credibility and the internal consistency of her narrative would have been equally beneficial to either party. Given this reality, errors relating most directly to Williams also unfairly prejudiced Cobb. The individual and cumulative impact of the errors requires both men be given a new trial.

In remanding for a new trial, we should also address alleged pretrial errors concerning the legality of Cobb's arrest and thereby eliminate the necessity of further litigation on these issues. Arguing that Cobb's constitutional rights were violated, the defendants contend that no probable cause existed for his arrest. It is urged that he was improperly arrested in his hotel room without a warrant, and that the police did not "knock and announce" before making a forcible entry.

On December 5, 1977, three weeks after the armed robbery and murders were committed, Perry Cobb was in his hotel room. The police knocked on his door and announced that they were police officers. They waited approximately 15 seconds for Cobb to open the door. During this time, they heard a muffled response which enabled them to determine he was present, but it was not followed by his answering the door. When they heard what sounded like bedsprings creaking, they broke into his room with guns drawn and arrested him.

When the officers broke into the room, Cobb was wearing a wristwatch which, it was later learned, belonged to one of the victims, Charles Guccion. After taking Cobb to the police station and giving him *Miranda* warnings, the police obtained a statement explaining his possession of Guccion's watch. Cobb claimed that he had given his watch to a friend when he entered prison, but his friend had broken it. When he was released from prison, his friend had

given him this watch as a replacement.

At trial, however, Cobb admitted that he lied concerning his possession of the watch, and stated he had received it from Johnny Brown on the day after Thanksgiving in 1977. According to Cobb's testimony at trial, Brown approached him, said he needed a drug fix, and told him he would sell him the watch for $15. On review, Cobb contends that the watch and the false statements which he made at the time of his arrest, which were used to impeach him at trial, were the fruits of illegal police action and should have been suppressed.

During testimony on a motion to quash the arrest, Officer Paul J. Roppel, a homicide investigator, stated that Cobb was arrested based on information obtained from Phyllis Santini. Santini telephoned the police on the afternoon of December 5, 1977, and said she had information concerning the murders. An officer came to her house, picked her up, and took her to the police station at about 2 p.m. She told the police that she had driven the getaway car which Cobb and Williams used to commit the armed robbery and murders. She provided a description of the physical characteristics and clothing worn by the defendants, which coincided with the description provided by Arthur Shields. Moreover, her estimate of the time period during which the crimes occurred coincided with the estimated time which Shields provided to the police.

Additionally, as previously discussed, Santini told the police of admissions which Cobb made before and after the crimes which established a motive and corroborated what the police knew concerning the limited financial success of the armed robbery. From police records, the police were also aware of Cobb's violent reputation and previous conviction for aggravated battery. Based on the totality of these circumstances, immediately after the interview the police, without an arrest warrant, went to the hotel room where Santini told them Cobb could be found. The arrest

occurred at about 11:30 p.m. on December 5, 1977.

When exigent circumstances exist, the police may make a warrantless, in-home arrest without violating the fourth amendment. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159.) No clear-cut set of legal rules exists to determine the presence of exigent circumstances. This court has held that the guiding principle is reasonableness under constitutional provisions governing searches and seizures. *People v. Abney* (1980), 81 Ill. 2d 159, 173.

In making a retroactive determination of whether the police acted reasonably, this court must determine the propriety of police conduct according to the "circumstances as known to the officials at the time they acted." (*People v. Abney* (1980), 81 Ill. 2d 159, 173.) If, for example, a felon has committed a serious and violent offense, the police are more likely to be justified in immediately apprehending him. (*Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385, 392.) If the suspect is reasonably likely to be armed or has a violent disposition, these facts will also militate against the necessity of complying with the warrant requirement and will serve to justify a prompt in-home arrest. *People v. Abney* (1980), 81 Ill. 2d 159, 173.

While recognizing that these factors must only be satisfied on balance and may not be present in every case (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 1005; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 65), the courts have also considered other factors in determining the propriety of a warrantless arrest: the immediacy of the arrest after the crime or the acquisition of information establishing probable cause, a clear showing of probable cause, a strong reason to believe that the suspect is on the premises being entered, the likelihood he will escape if not swiftly apprehended, and the peaceful circumstances of the entry. *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385, 392-93; *People v. Abney* (1980), 81 Ill. 2d 159, 173.

We find that the events culminating in Cobb's arrest justified the police in making a warrantless, in-home arrest. Although Phyllis Santini's possible criminal involvement in the case indicates that she might be an unreliable informant, the police had substantial, corroborating evidence indicating that Cobb was involved in the crimes. The information provided by Santini was corroborated not only by the age, height, complexion, and clothing descriptions provided by Arthur Shields, but also by the time of day when Shields estimated he saw the suspects at Mel's, which also coincided with the approximate time at which the coroner's report established the murders occurred. The statements which Cobb made to Santini established a motive for his actions and corroborated other police knowledge concerning the financial failure of the armed robbery. This substantial, independent corroboration, coupled with her statements, established probable cause. Whether or not probable cause for an arrest exists depends upon the totality of the facts and circumstances known to the officers when the arrest was made. See *People v. Clay* (1973), 55 Ill. 2d 501, 504-05.

From the position of the victims, the location of the bullet wounds, and other physical evidence, the police were able to infer that the killers acted intentionally and with premeditation in committing these serious, violent crimes.

By virtue of its previous experiences with Cobb, the Chicago police department was aware that he had been charged with a previous homicide and convicted of an aggravated battery. In the aggravated battery, he had shot an acquaintance in the head at point-blank range when he walked into the room at defendant's call. Moreover, Cobb committed the aggravated battery using the same caliber weapon that had been used in murdering Kanter and Guccion. The police had every reason to believe they were dealing with a violent individual who was more than likely armed and who was certainly dangerous and a hazard to

public safety.

The defendants stress that since the arrest occurred three weeks after the armed robberies and murders, the police were not in "hot pursuit" and should have obtained a warrant. Exigent circumstances may arise, however, not only immediately after the perpetration of the crime, but also when additional facts justify immediate action. (See, e.g., *People v. Robinson* (1980), 91 Ill. App. 3d 1138; *People v. Haynes* (1980), 89 Ill. App. 3d 231; *In re Willis* (1980), 89 Ill. App. 3d 347.) In *Robinson* the court held that the police received sufficient, reliable information to establish probable cause and justify an immediate arrest even though the information was received two months after the crimes occurred. In our case, while the arrest of Cobb occurred three weeks after the crimes, it was within minutes of receipt by the police of new material information establishing probable cause to believe Cobb committed the offense. The police were also now aware that Cobb lived within a few blocks of the police station. After the police officer had picked up Phyllis Santini at her home, the possibility existed that Cobb would be alerted to the fact that Santini was being interrogated. (See *People v. Henderson* (1981), 96 Ill. App. 3d 232, 237.) He would then have an incentive either to flee or seek to prevent his peaceful arrest. We conclude that the police were not required to wait for him to escape by the delay involved in seeking a warrant. They therefore properly acted immediately on Santini's information. See *People v. Barbee* (1966), 35 Ill. 2d 407, 411.

While the entry was forcible, the police demonstrated a clear attempt to comply with the "knock and announce" rule and the policies buttressing it. No statutory or constitutional authority requires an officer to announce his authority and purpose prior to entering a dwelling to make an arrest. (*People v. Wolgemuth* (1977), 69 Ill. 2d 154, 162.) However, we acknowledged in *Wolgemuth* that the rule

serves important functions and is one factor to consider in deciding whether a subsequent entry to arrest is constitutionally reasonable. "The function of the requirement to announce authority and purpose is to notify the person inside of the presence of police and to afford the person an opportunity to respond, so that violence can be averted and privacy protected." *People v. Wolgemuth* (1977), 69 Ill. 2d 154, 166.

In this case Cobb was made aware of the presence of the officers by their knocking on his door and announcing they were police officers. We conclude that the 15 seconds the officers waited after hearing sounds within the room was a sufficient time for Cobb to either answer the door of an apartment, or at least give some indication he intended to do so. The totality of circumstances in this case demonstrates the reasonableness of the arrest and indicates that, on balance, the requirements of *Abney* have been satisfied.

Because of the aforementioned trial errors, however, the convictions and sentences are reversed and the cause remanded to the circuit court of Cook County for a new trial.

*Reversed and remanded.*