2021 IL App (1st) 182282-U

THIRD DIVISION
Order filed June 23, 2021
Modified Upon Denial of Rehearing August 11, 2021

1-18-2282

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 17386 |
| | ) | |
| STEPHEN CRUMP, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1       *Held:* Although police had probable cause to arrest defendant, they lacked sufficient exigent circumstances justifying their warrantless entry into his apartment to arrest him, and the State did not meet its burden to establish that his girlfriend's subsequent consent to search was voluntary. We vacate the order denying the motion to suppress and remand the cause for the trial court to conduct a hearing on the State's attenuation evidence. We retain jurisdiction over this case to resolve all remaining issues after the hearing.

¶ 2       After a jury trial, defendant Stephen Crump was convicted of the murder of Marcellino

White, who was fatally shot outside a barbershop at 3:30 p.m. on September 22, 2015. Witnesses

did not see the shooting but gave police a description of the suspect and the license plate number

of the rented Jeep the suspect drove away in. Eight hours later at 11:30 p.m., police officers

arrested Crump at the apartment he shared with his girlfriend and her six-year-old son. The officers did not have an arrest warrant or search warrant. The officers obtained the consent of his girlfriend to search the apartment, which resulted in police finding evidence against defendant for use at trial.

¶ 3        Following the denial of Crump's pretrial motion to suppress evidence, a jury convicted him of first degree murder. Crump filed a motion for a new trial objecting to the denial of his pretrial suppression motion and the trial court denied his motion after a hearing. The court sentenced him to 65 years' imprisonment for murder, which included a 25-year enhancement for using a gun in the commission of the offense.

¶ 4        On appeal, Crump contends there were no exigent circumstances to excuse the warrantless entry and nonconsensual search of his apartment, the trial court abused its discretion by denying his right to present evidence that his brother was the shooter and allowing the State to introduce other-crimes evidence during closing argument, and his aggregate sentence of 65 years is excessive. For the following reasons, we vacate the trial court's order denying the motion to suppress, remand this case to allow the court to conduct a hearing on the State's evidence of attenuation and we retain jurisdiction of the case to resolve all remaining issues.

¶ 5                                    BACKGROUND

¶ 6                              Motion to Suppress Evidence

¶ 7        Prior to trial, Crump filed a motion to suppress evidence that police seized from his apartment. He did so pursuant to section 114-12(a)(1) of the Code of Criminal Procedure of 1963, which allows a defendant to challenge the legality of a warrantless search and seizure. 725 ILCS 5/114-12(a)(1) (West 2016). In his motion, defendant asserts the fruits of his unlawful arrest and search of the apartment, including a Glock pistol, should be suppressed.

¶ 8        At the hearing on the motion to suppress, Breiana Avery testified about her encounter with police on the night of her boyfriend's arrest. She had resided in the apartment with defendant for more than a year. When she and her son Amari came home around 8:00 p.m., Crump was playing video games in the living room. Around 11:30 p.m., she heard a bang at the front of the apartment. Police officers dressed in "SWAT attire" came through the front and back entrances. The officers handcuffed Crump in the living room. They handcuffed Avery, seated her next to Crump in the living room, and took Amari to the kitchen. After the officers took Crump outside, they walked Avery into the kitchen where Amari was. The officers found three firearms. Two were hidden inside the stove and another was hidden above a cabinet. Two officers walked Avery to the back porch and explained the charges against Crump. They asked Avery for consent to search the apartment. Avery testified the officers told her she would be charged for the recovered firearms if she did not consent and that they would report her to child welfare authorities to have Amari taken away. Then the officers escorted Avery to her bedroom, removed her handcuffs, and gave her a consent to search form. When she signed the form at 11:50 p.m., the spaces provided for her address as well as the officers' names were not filled in. After the officers left, Avery noticed chunks of wood missing from the doorframes of the foyer door and front door to the apartment.

¶ 9        On cross-examination, Avery acknowledged Crump was not on the lease but stated her brother was. And before the officers entered, she did not hear the front doorbell or a knock at the back door, nor did she see Crump leave the apartment.

¶ 10       Defense counsel presented two stipulations. First, Detective Mark Baxtrom arrested Crump inside the apartment at 11:30 p.m. Second, the subsequent search of the apartment produced a .45 caliber Smith & Wesson Model 4526 pistol, a .22 long rifle H&R Sportsman

revolver, and a 9-millimeter Glock pistol that was hidden in the oven. A .30 caliber U.S. Carbine rifle and two red hoodies were recovered from the living room couch.

¶ 11        After the defense rested, the State presented the testimony of Officer Anthony Pacino. Detectives asked him to help in locating a murder suspect. Pacino was told the suspect had been identified by two people, who gave a physical description of the suspect, the vehicle he drove, and a license plate number. He was also given defendant's name and a photograph of him. There were several addresses being investigated and Pacino was assigned to the address where defendant was ultimately found.

¶ 12        Around 11:00 p.m., Pacino arrived at the address dressed in plain clothes and driving an unmarked police car. He parked across the street from defendant's second-floor apartment. Using binoculars, he saw Crump's face in the front window. He recognized Crump based on his photograph.

¶ 13        Pacino radioed his fellow officers that he saw Crump inside the apartment. Officer Honore reported the suspect's vehicle was parked in the carport behind the apartment. Pacino knocked on the door of the first-floor apartment and obtained permission from the resident to access the enclosed staircase behind the building. From outside the back door of the second-floor apartment, he heard Detective Baxtrom ring the front doorbell. He also heard the inside voices of a woman and child but could not discern what they were saying. He knocked on the back door saying, "Chicago police, open the door," but no one answered.

¶ 14        Meanwhile, Baxtrom radioed that Crump answered the door in the foyer but then ran back upstairs. And Officer Trinidad reported seeing Crump running toward the back of the apartment. At that point, Sergeant Roberts decided to remove the foyer door from its hinges.

¶ 15        Pacino went to the front of the building and watched as officers pulled the pins from the door hinges. After the foyer door was removed, Pacino and other officers walked upstairs, knocked on the front door of Crump's apartment, and announced their office. When no one answered, officers pulled the pins from the door hinges and removed the front door.

¶ 16        Pacino entered the apartment with Officer Perez, Detective Baxtrom, and Sergeant Roberts. They all had their guns drawn. Crump was arrested and taken outside in handcuffs. Avery and her son were not handcuffed. After Avery signed a consent to search form, officers recovered evidence from the kitchen and spare bedroom. According to Pacino, it could take one to three hours to obtain a search warrant but more later in the day when it is harder to find a judge.

¶ 17        On cross-examination, Pacino acknowledged being told the suspect's vehicle was registered to a car rental company under defendant's name and address. And although the plan was to arrest Crump at that address, he did not ask if arrest or search warrants had been issued. He also admitted not asking Crump for consent to search the apartment after his arrest.

¶ 18        Detective Baxtrom testified that he arrested defendant based on the following information. A fatal shooting occurred at 3:30 p.m. Two witnesses identified "Stephen Crump" as the suspect. They described the suspect as being armed with a handgun, wearing dreadlocks and a red hoodie, and driving a gray Jeep. When Baxtrom arrived at defendant's apartment, fellow officers informed him the Jeep was parked behind the building and Crump was observed inside the second-floor apartment. Baxtrom had the Jeep towed but he did not know when that was done.

¶ 19        Baxtrom rang the front doorbell for several minutes. During that time, an officer stationed at the back door reported hearing voices of a woman and child. When Crump came

downstairs and opened the foyer door, Baxtrom announced his office and Crump retreated upstairs. Then another officer saw Crump running toward the back of the apartment. At that point, Sergeant Roberts decided to remove the foyer door and then the front door to defendant's apartment. Baxtrom identified defendant in court as the person he arrested upon entering the apartment. After Crump was taken outside, Baxtrom asked Avery whether she had any weapons in the apartment; he mentioned seeing an empty holster near defendant. Avery then signed a consent to search form. Baxtrom filled out the spaces for the officers' names and read over the form before Avery signed it. Neither he nor his fellow officers suggested to Avery that her consent was compulsory; no one suggested DCFS would take Amari if she did not consent. Baxtrom did not offer or attempt to get a search warrant because the consent to search "was the fastest way that we would be able to do what we needed to do."

¶ 20     On cross-examination, Baxtrom acknowledged he learned defendant's name and address on the day of the shooting after the suspect's vehicle was traced to a car rental company. Baxtrom testified that before going to defendant's address he was told two witnesses had identified defendant as the suspect. Baxtrom stated those witnesses identified defendant at the Area South police station. Despite knowing defendant's name and address, he did not obtain arrest or search warrants because: there were multiple addresses under investigation; Avery had to work in the morning; and it was late.

¶ 21     The trial court denied Crump's motion to suppress evidence. The court found exigent circumstances existed justifying the warrantless arrest of Crump inside his apartment. In doing so, the court noted, "defendant apparently was identified by two individuals as being the offender." Although Crump could not have escaped, the court stated his location inside with two others, the seriousness of the offense, and the lateness of the hour justified the officers'

warrantless entry into the apartment. The court believed "it was prudent for the police officers to be concerned about the safety of the other individuals inside" because "desperate people do desperate things." As for the subsequent search, the court did not believe Avery's testimony that she was coerced into signing the consent to search form. The court found the officers testified credibly regarding Avery's voluntary consent and concluded the search was justified.

¶ 22                                             Jury Trial

¶ 23        At trial, the State presented testimony from occurrence witnesses and the officers involved in their identification of the suspect.

¶ 24        Jamal Mitchell testified he was a barber at Miss B's barbershop. Around 3:00 p.m., he gave Marcellino White a haircut. About 25 minutes after White left, someone walked in and prompted Mitchell to go outside. When he did, Mitchell saw White motionless on the ground in the church parking lot next door. He also saw police officers and paramedics.

¶ 25        Lashenna Turner and Chanette Matthews were neighbors in the apartment building across the alley from Miss B's barbershop. Turner testified she first noticed an unfamiliar Jeep parked behind her building around 3:00 p.m. The Jeep left and returned several times, parking in the same spot each time. About 45 minutes later, the driver stepped out of the Jeep holding a gun. Then the driver "just took off." Minutes later, she heard a "pow" and saw the driver run back to the Jeep and drive away.

¶ 26        According to Turner, the driver was male and wore a red hoodie over dreadlocks. She did not have a perfect view of the driver because he was running but she wrote down the license plate of the Jeep. Later, detectives came to her apartment and showed her a photo array. She was torn between two photographs and asked to view a lineup, which occurred the next day at the Area South police station. There she identified the person wearing a black sweatshirt as the

driver of the Jeep. She recalled telling detectives the driver was wearing a red hoodie and holding a gun with black and white gloves, but she could not identify him in court. On cross-examination, she admitted she did not see the shooting but saw the driver running back to his Jeep after she heard the "pow."

¶ 27     Detective Murray testified on the afternoon of the shooting, he looked up the Jeep's license plate number and then spoke to someone at Enterprise where the vehicle was leased from. He and his partner prepared the photo array that Turner viewed later that night. He was also present the next day when Turner viewed a lineup at the Area South police station. Turner identified a person wearing a black sweatshirt as the driver of the Jeep. Murray identified Crump in court as that person.

¶ 28     Jennifer Penza, a risk manager at Enterprise car rental, testified about the information required to rent a vehicle. Enterprise requires a driver's license, current address, phone number, email address, and credit card. The customer would receive a copy of the rental agreement with this information redacted for their privacy. An internal copy of the Jeep's rental agreement listed defendant's name and the address where he was found.

¶ 29     Matthews, who was Turner's neighbor, testified she lived on the third floor of the apartment building. Through her bedroom window, she could see Miss B's barbershop across the alley. Around 2:00 p.m., her boyfriend Omari Knowles called saying he was coming over. She looked out her bedroom window periodically as she was expecting Knowles to arrive by public transportation. Each time she looked out her window, she noticed the same gray Jeep parked in different spaces near the barbershop. The fourth time, the Jeep was parked in the vacant lot behind her apartment building. She wrote down the license plate number of the Jeep because it was parked so close to the front of her car, she did not recognize the Jeep, and her apartment had

been broken into recently. When Knowles arrived, Matthews looked out her kitchen window and noticed the Jeep was gone. Minutes later, the Jeep returned to the parking space next to her car. The driver stepped out of the Jeep in a red hoodie and holding a gun with white gloves. Matthews saw the driver run across the vacant lot and out of sight. Then she heard a loud firecracker noise and saw the driver run back to the Jeep and drive away. She gave Knowles the license plate number of the Jeep and he called 911.

¶ 30    The next morning, Matthews spoke to detectives at her apartment and told them what she saw. She subsequently viewed a lineup at the police station but could not identify the driver of the Jeep. She did not have a clear view of the driver's face and she was focused on the gun in his hand. However, she noticed he wore long dreadlocks underneath his hoodie.

¶ 31    Knowles testified he saw a gray Jeep parked in the vacant lot behind his girlfriend's apartment building. The driver got out and ran out of sight for a few seconds. Then Knowles heard a gunshot and saw the driver run back to the Jeep and drive away. He immediately called 911.

¶ 32    According to Knowles, the driver wore a red hoodie, white or gray athletic gloves, jeans, and gym shoes. Knowles described a young man with a long face, sharp chin, and thin moustache and eyebrows. He also noticed dreadlocks underneath the driver's hoodie and the pistol in his hand. Knowles identified defendant in court as the driver of the Jeep.

¶ 33    The day after the shooting, Knowles spoke to detectives at Matthews' apartment and then accompanied her to the police station. There, he viewed a photo array and identified defendant. He acknowledged, on cross-examination, the person in the photo that he selected was wearing a bright red shirt, not a red hoodie. He clarified he identified defendant based on his facial features.

¶ 34    Detective Hill testified he spoke to Lashenna Turner at her apartment on the day of the shooting. She gave him the license plate number of the suspect's Jeep and he asked Detective Murray to check the registration. The next day, Hill saw the Jeep in the impound lot being searched pursuant to a warrant. A pair of white leather gloves and a car rental receipt were recovered.

¶ 35    Officer Pacino and Detective Baxtrom testified similarly as before at the hearing on defendant's motion to suppress evidence.

¶ 36    Joseph Scumaci, an evidence technician, testified on the day of the shooting he photographed and inventoried evidence at the crime scene. He described photographs of a fired cartridge casing, pool of blood, white hat, and cigarette. The next day, he went to the impound lot and performed the same process on the suspect's Jeep pursuant to a search warrant. He also swabbed the Jeep for gunshot residue and recovered a pair of baseball gloves from the driver's side floorboard.

¶ 37    Gina Kotscharjan, a forensic scientist, compared the 9-millimeter cartridge casing recovered from the church parking lot with one from the Glock found in defendant's apartment. She concluded the Glock fired the recovered cartridge casing.

¶ 38    Another forensic scientist, Scott Rochowicz, found no gunshot residue on swabs taken from the Jeep. However, he found gunshot residue on the hoodies from defendant's apartment and the pair of gloves from the Jeep.

¶ 39    Frederick Scott, a latent fingerprint examiner, compared the fingerprint found on the Glock with the known impressions on defendant's fingerprint card. He concluded defendant left the fingerprint on the Glock.

¶ 40 The State rested its case in chief and defense counsel moved for a directed verdict. After the court denied the motion, the defense presented the testimony of defendant and his girlfriend.

¶ 41 Avery testified defendant's brother, Ronald, also stayed in the front room of the apartment, where there was a couch and a video game console. She referred to the room as a "man cave." Only Ronald kept clothes in that room. Ronald drove a gray Jeep and a burgundy SUV "of some sort." Avery had not seen Ronald in the days before the shooting and that morning his Jeep was not parked behind her apartment building. That night, she was awakened by officers in SWAT uniforms with flashlights and shotguns. Ronald died a few weeks before trial started.

¶ 42 On cross-examination, Avery admitted she previously testified she lived in that apartment with her son Amari and defendant, and she did not mention Ronald. She never mentioned Ronald to the officers because she was "unaware of the situation and the question wasn't asked."

¶ 43 Crump testified that he had not seen Ronald or his Jeep in the days before the shooting. Ronald also had a burgundy truck. Still, he gave Ronald his driver's license and credit card to rent a Jeep because Ronald did not have his own credit card.

¶ 44 On the day in question, Crump filled out job applications, played video games, and slept until about 4:00 p.m. Around that time, Ronald came home, ran into the front room, and took off his red hoodie. Then Ronald gave him a gun and left the apartment. Crump placed the gun in the oven to keep it away from Amari. When Amari and his mother came home, they ate dinner and watched television. Later that night, police "raided" the apartment and arrested him.

¶ 45 Michael Clancy, an attorney, testified he once represented defendant's brother Ronald on a felony charge. The court denied defense counsel's request to question Clancy about the nature of the charge, finding it irrelevant.

¶ 46 Following closing argument, the jury found defendant guilty of first degree murder. Defendant filed a motion for a new trial objecting to the denial of his pretrial suppression motion, which the trial court denied after a hearing. The court then sentenced him to 40 years' imprisonment for murder, plus a 25-year enhancement for using a gun.

¶ 47 ANALYSIS

¶ 48 In reviewing a trial court's ruling on a motion to suppress, we will uphold the court's findings of historical fact unless they are against the manifest weight of the evidence. *People v. Lee*, 214 Ill. 2d 476, 483 (2005). We remain free, however, to assess the facts relative to the issues presented and to draw our own conclusions when deciding what relief should be granted. *Id.* at 484. We thus review *de novo* the ultimate question of whether the evidence should be suppressed. *Id.* We may consider evidence presented at the suppression hearing and at trial when reviewing the propriety of a trial court's ruling on a motion to suppress. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 49 As a threshold matter, the State maintains we cannot consider the evidence presented at trial to overturn a suppression ruling because defendant did not ask the trial court to reconsider that ruling at trial. The State cites *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999), but courts have limited its application to instances where a defendant fails to renew an objection to the denial of the suppression motion in a posttrial motion. See *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 60 (and cases cited therein). In this case, defendant renewed his objection to the trial court's denial of his suppression motion in his motion for a new trial. Under these circumstances, we may consider the evidence presented at trial in reviewing the denial of defendant's suppression motion. *Id.*

¶ 50    On the merits, Crump contends the officers' warrantless entry into his home violates his fourth amendment protection against unreasonable searches and seizures. He argues the officers lacked exigent circumstances to excuse any warrants and they did not have voluntary consent to search his apartment. He also argues the officers testified inaccurately at the suppression hearing about the information they possessed before the search.

¶ 51                              Exigent Circumstances

¶ 52    We first address whether the warrantless entry by police into Crump's apartment was lawful. Crump argues the warrantless entry was unlawful because there were no exigent circumstances to excuse the warrant requirement. He asserts the fruits of his unlawful arrest and search of his apartment, including the Glock and the only pretrial lineup identification, should have been suppressed. The State counters exigent circumstances justified the warrantless entry into the apartment to arrest Crump for murder and his girlfriend Avery consented to the search of the apartment.

¶ 53    The United States and the Illinois constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Warrantless searches and seizures are presumptively unreasonable when they occur inside a home. *People v. Wear*, 229 Ill. 2d 545, 562 (2008). This presumption acknowledges the sanctity of the home and serves to balance an individual's freedom from unreasonable interferences with privacy and law enforcement's interest in protecting the community. *Id.* (citing *Payton v. New York*, 445 U.S. 573, 586-87 (1980)). However, the constitutionally prescribed sanctity of the home is not boundless. *Id.* at 563.

¶ 54    Police officers may enter a home to effectuate an arrest without a warrant when exigent circumstances exist. *People v. Cobb*, 97 Ill. 2d 465, 484 (1983). Factors that may be considered

in determining whether exigent circumstances exist include the following: (1) whether the offense was recently committed; (2) whether there was any delay by the officers when a warrant could have been obtained; (3) whether a grave offense is involved; (4) whether the officers reasonably believed the suspect to be armed; (5) whether the officers acted upon a clear showing of probable cause based on the type of reasonably trustworthy information; (6) whether it was likely the suspect would have escaped; (7) whether the officers had a strong reason to believe the suspect was inside the dwelling; and (8) whether the entry was made peaceably. *People v. Abney*, 81 Ill. 2d 159, 169-72 (1980). The guiding principle in determining whether exigent circumstances exist is reasonableness and each case must be decided based on the totality of the circumstances known to the officers when they acted. *Cobb*, 97 Ill. 2d at 484. The State bears the burden of demonstrating that exigent circumstances justify a warrantless search or arrest. *People v. Foskey*, 136 Ill. 2d 66, 75 (1990).

¶ 55    Crump acknowledges the gravity of the offense and that facts suggested the suspect may be armed. However, he maintains other factors weigh against the trial court's finding that exigent circumstances existed. He asserts there was no likelihood of escape where the officers had his apartment surrounded and thus the officers had time to get a warrant. Moreover, the officers spent 45 minutes outside defendant's apartment before they entered. Defendant reasons if the officers had time to contact the car rental company, and spend 45 minutes outside his apartment before entering, they had time to get arrest and search warrants. He also asserts there was no clear showing of probable cause to justify the warrantless entry because although the officers "may have had probable cause when they found the Jeep rented in [his] name at the address listed on the lease agreement, *no* witnesses had identified [him] as the man with the gun at the time of the search and arrest." Moreover, he argues the emergency aid exception does not apply

14

in this case because Officer Pacino did not testify that the voices of a woman and child that he heard from outside the back door suggested they were in danger.

¶ 56    Considering the totality of the circumstances facing the officers when they removed the door to defendant's apartment and entered, we conclude that although police had probable cause to arrest Crump, they lacked sufficient exigent circumstances to justify their warrantless entry to effectuate that arrest. "That probable cause existed, however, is not alone sufficient to justify a warrantless entry into a suspect's home to effect an arrest." *Foskey*, 136 Ill. 2d at 77 (citing *Payton*, 445 U.S. 573).

¶ 57    When Sergeant Roberts decided to remove the doors, the officers knew that witnesses described an armed suspect and wrote down the license plate number of the suspect's Jeep, which led to the discovery of defendant's name and apartment address. There, officers saw the Jeep parked behind the building. Officer Pacino identified Crump through a window based on a photograph and he heard the voices of a woman and child when he went to the back door. Detective Baxtrom knocked on the foyer door and Crump answered but then retreated upstairs. Then Officer Trinidad saw defendant run toward the back of the apartment.

¶ 58    On balance, Crump correctly observes no witnesses had identified him before the warrantless arrest and search. Turner and Matthews, who lived in the apartment building across the alley from the barbershop, viewed photo arrays on the day of the shooting. They did not identify the suspect. Thus, defendant claims the officers testified inaccurately at the suppression hearing that two witnesses identified him as a suspect on the day of the shooting. He reasons the testimony adduced at trial shows Turner and Knowles identified him the day after his arrest.

¶ 59    At the suppression hearing, Officer Pacino and Detective Baxtrom stated before they went to defendant's address, they were informed that two witnesses had identified defendant as

the suspect. Pacino explained on cross-examination that defendant's name and address were obtained from the car rental company that leased the suspect's Jeep. Baxtrom acknowledged the same on cross-examination. Baxtrom also stated the identification of defendant by those witnesses took place at the Area South police station. When ruling, the trial court discussed whether the officers had probable cause to arrest defendant and noted "defendant apparently was identified by two individuals as being the offender." At trial, however, the occurrence witnesses testified they identified defendant at the Area South police station the day after the shooting. Notwithstanding this discrepancy, the officers had probable cause to arrest defendant. The issue here is whether exigent circumstances justified the officers' warrantless entry into the apartment to arrest defendant. We conclude they did not. Additional facts were necessary to justify the warrantless entry. See *Cobb*, 97 Ill. 2d at 486 ("Exigent circumstances may arise, however, not only immediately after the perpetration of the crime, but also when additional facts justify immediate action.").

¶ 60        The State argues there was a strong likelihood of defendant escaping even though the front and back doors to the apartment were guarded by the officers. According to the State, "the very real possibility existed that he could try to escape by shooting his way out at any moment, starting with the officers at the apartment door who he could fire on without warning through the closed door." The State reasons defendant expressed his intent to escape by answering the foyer door and running back upstairs upon seeing police. The State adds there was the potential defendant was still armed and his Jeep was parked behind the building.

¶ 61        However, these possibilities do not necessitate finding there was a strong likelihood of defendant escaping. Our courts regularly find running from police insufficient to show reasonable suspicion to conduct an investigatory stop; an arrest demands probable cause, not

reasonable suspicion. See *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 67 (and cases cited therein); accord *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 22 (reasonable suspicion is a less stringent standard than probable cause). In this case, there was no likelihood of defendant escaping because officers secured the front and back doors of the apartment. The record is unclear as to when defendant's Jeep was towed, but defendant's access to the Jeep was certainly impeded by the officers and they did not use the opportunity to get arrest or search warrants. See, *e.g.*, *People v. Wimbley*, 314 Ill. App. 3d 18, 28 (2000) (no factual basis supported the inference the defendant was likely to flee where officers could have guarded the apartment to prevent any flight while a warrant was obtained). No officer questioned the need for any warrants even though Officer Pacino and Detective Baxtrom knew the plan was to arrest defendant if they found him at any of the multiple addresses under investigation. See *People v. Eden*, 246 Ill. App. 3d 277, 286 (1993) (testimony established the officers did not feel a warrant was required). Even so, Pacino testified it could take several hours to get a search warrant and even longer later in the day when judges are harder to find. Baxtrom testified he did not offer or attempt to get a search warrant because obtaining Avery's consent to search "was the fastest way that we would be able to do what we needed to do." One of the practical difficulties facing police officers is the time required to obtain a warrant. *People v. Bui*, 381 Ill. App. 3d 397, 408 (2008) (citing *United States v. Garcia*, 882 F.2d 699, 703 (2d Cir.1989)). Despite the late hour, there was no testimony that obtaining a warrant would have been difficult; in fact, the officers obtained a warrant to search the Jeep. See *Eden*, 246 Ill. App. 3d at 286 (there was no indication obtaining a warrant would be difficult). The circumstances here do not show that any delay in obtaining arrest and search warrants would have hampered the investigation or apprehension of defendant. See *People v. Davis*, 398 Ill. App. 3d 940, 949-50 (2010) (and cases cited therein) (that officers acted quickly

in locating the defendant and had probable cause to arrest him did not excuse the warrant requirement because there was no immediate and clear danger to the police or others).

¶ 62    Aside from possibilities, there was no evidence that defendant was still armed or that he would shoot his way out. No weapons were observed by the officers before their entry. There was no indication defendant was violent and records show he had a minimal criminal history. Of course, "the presence of a weapon coupled with knowledge of prior violent crimes or dangerous propensities by the occupants may constitute an exigent circumstance." *People v. Fonville*, 158 Ill. App. 3d 676, 684 (1987); accord *People v. Condon*, 195 Ill. App. 3d 815, 822 (1990) ("The presence of weapons alone does not create an exigent circumstance."). None of these circumstances were developed in the record.

¶ 63    Likewise, there was no indication the others in the apartment were in danger or required assistance. Although the court stated it was prudent of the officers to be concerned about the safety of the other individuals inside, there was no testimony that would support the inference that Avery and her son were in imminent danger or needed help. Rather, the mere fact defendant would not allow the officers inside the apartment was not inherently suspicious or grounds for believing there was an emergency; it was defendant's constitutional right. See *People v. Borders*, 2020 IL App (2d) 180324, ¶ 44 (quoting *Kentucky v. King*, 563 U.S. 452, 470 (2011) ("even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time"). The totality of the circumstances here did not suggest an urgency, actual risk of danger, or likelihood of escape. See *Foskey*, 136 Ill. 2d at 84 (the circumstances facing the officers when they arrested the defendant did not suggest the immediacy and real threat of danger or likelihood of flight found in cases where warrantless searches were valid).

¶ 64    As the court observed in *People v. Davis*, 398 Ill. App. 3d 940, 951 (2010), "were we to hold that exigent circumstances existed justifying the warrantless entry and arrest in the present case, police could avoid the warrant requirement of the fourth amendment so long as they quickly and accurately tracked a defendant to a private residence and entered in a peaceful manner. To do so would all but eliminate the exigent-circumstances requirement that *Payton* imposed upon warrantless arrests."

¶ 65                              Consent by Co-Tenant to Search

¶ 66    Notwithstanding the absence of sufficient exigent circumstances, the State maintains the search of the apartment after defendant's warrantless arrest was made pursuant to Avery's voluntary consent to search. The voluntariness of a consent to search must be determined by examining the totality of the circumstances. *People v. Graf*, 265 Ill. App. 3d 746, 750 (1994) (citing *People v. Casazza*, 144 Ill. 2d 414, 417 (1991)). The State bears the burden of showing that consent was voluntarily given. *Davis*, 398 Ill. App. 3d at 956. Consent is involuntary where it is the product of acquiescence or submission to the assertion of lawful authority. *Id.* Consent is also involuntary where it is "inextricably bound up with illegal conduct and cannot be segregated therefrom." (Internal quotations omitted.) *Id.* (citing *People v. Freeman*, 121 Ill. App. 3d 1023, 1032 (1984) (quoting *People v. Kelly*, 76 Ill. App. 3d 80, 86 (1979)).

¶ 67    The Supreme Court has held the consent of a person who has common authority over the premises is valid against an absent, nonconsenting person who shares that authority. *People v. Parker*, 386 Ill. App. 3d 40, 44 (2007) (citing *United States v. Matlock*, 415 U.S. 164, 170 (2007)). On the other hand, a search will be found unreasonable where the defendant is present at the scene and expresses his refusal to allow the officers to enter and search the premises. *Id.* (citing *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)). When evidence regarding the issue of

consent is conflicting, the trial court's finding will not be disturbed unless it was clearly unreasonable. *People v. Pitman*, 211 Ill. 2d 502, 527 (2004).

¶ 68    After reviewing the record, particularly the transcript of the hearing on defendant's motion to suppress evidence, we conclude the trial court erred in determining that Avery voluntarily consented to a search of the apartment. We acknowledge the trial court did not believe Avery's testimony that the officers threatened to take her son away to get her to sign the consent and accepted the officers' denial they threatened her. The credibility of witnesses and the weight of the evidence are strictly within the discretion of the trier of fact. *People v. Hernandez*, 278 Ill. App. 3d 545, 552 (1996). The trial court did not believe Avery's testimony that she was threatened or that her consent was coerced; and that determination is entitled to our considerable deference. See *People v. Schreiner*, 2021 IL App (1st) 190191, ¶ 61.

¶ 69    However, the fact that Avery signed a consent to search form is not dispositive where the circumstances show her consent was elicited through some form of coercion. See *Graf*, 265 Ill. App. 3d at 750 (that the defendant and his parents signed a consent to search is not dispositive if circumstances show some form of coercion). Courts have consistently recognized the nuance between whether consent was given and whether consent was voluntary. See *People v. Parker*, 312 Ill. App. 3d 607, 616 (2000) (and cases cited therein). "Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " *People v. Anthony*, 198 Ill. 2d 194, 202 (2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." (Internal quotations omitted.) *Id.* (quoting *Schneckloth*, 412 U.S. at 229).

20

¶ 70      Yet even discounting Avery's testimony entirely, the State still had the burden of proving voluntary consent, which it did not do. See *Schreiner*, 2021 IL App (1st) 190191, ¶ 61. Here, the circumstances of the search and arrest created "a coercive atmosphere from the start" and Avery's consent to search was a product of that coercion. See *Graf*, 265 Ill. App. 3d at 751 (the warrantless entry into the home "served to create a coercive atmosphere from the start"). Several officers wearing SWAT gear and with their weapons drawn, entered Avery's apartment without permission at 11:30 at night by removing the doors to the apartment. They then arrested and handcuffed defendant and took him away. Detective Baxtrom testified he did not get a search warrant because asking for consent was the "fastest way that we would be able to do what we needed to do." Although defendant and Avery were both present when the officers entered the apartment, they did not ask defendant for his consent to search. Only after defendant was arrested and taken outside did Baxtrom mention seeing an empty holster and then ask Avery whether she had any weapons inside the apartment. The consent given in this case is inextricably bound up with illegal conduct of entering the apartment without a warrant by taking off the doors. Indeed, the consent in this case was signed only after police officers exercised their authority by removing the doors from their hinges, then entering the apartment without permission with weapons drawn, and then handcuffing and taking defendant away.

¶ 71      Consent can be nonverbal. *Schreiner*, 2021 IL App (1st) 190191, ¶ 51. Defendant's act of shutting the door upon seeing police in "SWAT attire" is more likely to communicate the end of the encounter than an invitation to enter the apartment and seek consent to search from his girlfriend. See *id.* ¶ 60. "The fact that a defense witness, who claimed consent was *not* given, is not a credible witness is no substitute for affirmative proof that consent *was* given." (Emphasis in

original.) *Id.* ¶ 61. We conclude the search was unlawfully conducted without a warrant and no valid consent was given, and thus the court erred when it denied the motion to suppress.

¶ 72     The State did not have the opportunity to establish attenuation as to the evidence resulting from the search because the trial court agreed with the State that Avery voluntarily gave consent to search the apartment. Under these circumstances, the proper course is not to order suppression of the evidence produced by the nonconsensual search but to give the prosecution an opportunity to argue attenuation. See *Schreiner*, 2021 IL App (1st) 190191, ¶ 73 ("despite our holding that the warrantless entry was not justified by voluntary consent and thus constituted a *per se* unreasonable search, the proper course is not to order suppression of that evidence but to give the State the opportunity to argue attenuation"). Crump notes the evidence seized from the apartment constituted a good portion of the evidence against him. The nonconsensual search that followed the officers' unlawful entry led to the recovery of evidence the State used against defendant at trial. See *id.* Accordingly, we vacate the order denying the motion to suppress and remand this case to allow the State to present attenuation evidence.

¶ 73                                    CONCLUSION

¶ 74     We conclude that although police had probable cause to arrest Crump, they lacked sufficient exigent circumstances to justify their warrantless entry to effectuate that arrest and the State did not meet its burden of proving Avery's subsequent consent to search was voluntary. However, the State should be allowed to establish any attenuation as to the evidence produced by the search. Accordingly, we vacate the order denying defendant's motion to suppress and remand this cause solely to allow the trial court to conduct a hearing on the State's evidence of attenuation. We retain jurisdiction over this case to decide all remaining issues after the hearing.

¶ 75     Vacated and remanded with directions.